IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REVEREND PATRICK MAHONEY**, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| -vs- | ) |
| | ) |
| **HON. GALE NORTON,** in her official capacity | ) |
| as **SECRETARY OF THE UNITED** | ) |
| **STATES DEPARTMENT OF THE** | ) |
| **INTERIOR,** et al., | ) |
| | ) |
| *Defendants.* | ) |

### STATEMENT OF POINTS AND AUTHORITIES SUPPORTING THE TEMPORARY RESTRAINING ORDER MOTION

### INTRODUCTION

Patrick Mahoney, a Presbyterian minister of the Gospel, fully appreciates the aptness in the post-September 11, 2001, world, of Thomas Paine's observation, "[t]hese are the times that try men's souls." Thomas Paine, "The American Crisis," at 1 (No. 1, Dec. 19, 1776).[1] But with Paine, and so many others who have preferred liberty, and its unavoidable companion, uncertainty, Reverend Mahoney adopts the sound counsel of a printer from Philadelphia:

They that give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety.

Attributed to Benjamin Franklin.

Reverend Patrick and the Christian Defense Coalition, by the undersigned counsel, come before the Court seeking the entry of a temporary restraining order to prohibit and restrain the

---

1.    The entirety of issue number one of The American Crisis is available for viewing at http://memory.loc.gov/rbc/rbpe/rbpe03/rbpe039/03902300/001dr.jpg.

Secretary of the Interior, the National Park Service, and all persons acting in concert with them from interfering with two prayer vigils to be conducted under "deemed granted" permits obtained by Reverend Mahoney on August 15, 2002.

This Statement of Points and Authorities is submitted in support of that motion.

## STATEMENT REGARDING FACTS

The plaintiffs adopt and ratify the facts stated in the exhibit supporting the motion for a temporary restraining order, and more particularly, the declaration of Reverend Mahoney with its attachments, as though fully set forth herein.

## ARGUMENT

**AN ORDER TEMPORARILY RESTRAINING THE DEFENDANTS FROM PROHIBITING OR INTERFERING WITH PEACEFUL, NONVIOLENT PRAYER VIGILS OF THE PLAINTIFFS IS JUSTIFIED ON THE FACTS AND THE LAW**

## I.    STANDARD FOR THE GRANT OF TEMPORARY RELIEF

To obtain injunctive relief, the plaintiffs must demonstrate (1) that they are likely to prevail on the merits, (2) that they will suffer irreparable injury if injunctive relief is denied, (3) that the granting of injunctive relief will not cause substantial harm to the other parties and finally, (4) that the granting of injunctive relief is in the public interest, or at least, not adverse to the public interest. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-674 (1985); Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc, 559 F.2d 841, 843 (1977); Virginia Petroleum Jobbers v. FPC, 259 F.2d 921, 925 (1958).

Mahoney and the Christian Defense Coalition are likely to prevail on their legal claims, see Arguments II, infra. Further, they satisfy the requirement of showing irreparable injury, see

Argument III, infra. The defendants will not suffer any substantial harm if enjoined from molesting, interfering with, or disrupting the plaintiffs' planned peaceful prayer vigils, see Argument IV, infra. Finally, the interest of the public is with the preservation of constitutional rights, not their suppression; therefore the requested injunctive advances the public interest, see Argument V, infra.

**II.   MAHONEY AND THE CHRISTIAN DEFENSE COALITION ARE LIKELY TO PREVAIL IN THEIR CLAIMS AGAINST THE DEFENDANTS FOR REVOKING THE "DEEMED GRANTED" PERMITS MAHONEY OBTAINED ON AUGUST 15, 2002, AND FOR MOLESTING, INTERFERING WITH, AND SUPPRESSING THEIR PLANNED, PEACEFUL PRAYER VIGILS.**

   A.   MAHONEY AND THE CHRISTIAN DEFENSE COALITION ARE LIKELY TO PREVAIL ON THEIR FIRST AMENDMENT CLAIMS

      1.   THE STANDARD FOR ANALYSIS OF CLAIMED VIOLATIONS OF THE RIGHT TO FREEDOM OF EXPRESSION

The Supreme Court employs "forum" analysis to resolve claims of access to public property for purposes of free speech. Cf., e.g., Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37 (1983) (internal mail system of public school not a traditional or designated public forum); United States v. Grace, 461 U.S. 171 (1983) (public sidewalk surrounding U.S. Supreme Court is a traditional public forum); Cornelius v. N.A.A.C.P. Legal Defense and Education Fund, Inc., 473 U.S. 788 (1985) (Combined Federal Campaign is not a traditional or designated public forum). As exemplified in Cornelius, the analysis proceeds in three steps.

First, the activity threatened or affected by government action must be identified, and it must be determined whether it is speech protected under the First Amendment. 473 U.S. at 797. (Obviously, in cases not involving expression or expressive activities, the analysis concludes here.) Second, it is essential to "identify the nature of the forum, because the extent to which the

Government may limit access depends on whether the forum is public or nonpublic." Id.  Third, where constitutionally protected speech is at stake, the government action must be analyzed according to the standards applicable to the relevant forum.  Id.  When the foregoing analysis is applied in the instant case, the plaintiffs' claim for injunctive and declaratory relief are demonstrably well-founded and justified.

> a.    MAHONEY AND THE CHRISTIAN DEFENSE COALITION'S PRAYER VIGILS ARE CONSTITUTIONALLY PROTECTED EXPRESSION

The prayer vigils planned for August 30, 2002, September 11, 2002, and for time to time thereafter, will consist, in their entirety, of prayer, a protected form of speech.  The first step in a forum-based analysis is to determine whether the challenged government conduct affects protected expression.  Cornelius, 473 U.S. at 797.  This expression is a paradigm of protected expression under the First Amendment.

It is a constitutional axiom that religious speech and discussion "are forms of speech protected by the Constitution." Widmar v. Vincent, 454 U.S. 263, 269 (1981).  Mahoney's and the Christian Defense Coalition's prayer, "far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." Capital Square Review and Advisory Board v. Pinette, 515 U.S. 753, 760 (1995); see also Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384 (1993); Westside Community Schools v. Mergens, 496 U.S. 226 (1990); Widmar; Heffron v. ISKCON, 452 U.S. 640 (1981).

> b.    LAFAYETTE PARK IS A TRADITIONAL PUBLIC FORUM.

The site of Mahoney and the Christian Defense Coalition's planned event is Lafayette Park,

which is a public square including green spaces, statuary, sidewalks, and other entirely typical park elements. The second step in the forum-based analysis requires this Court to decide the nature of the desired venue. Cornelius, 473 U.S. at 797.

The Supreme Court has identified three categories within which public property falls, depending upon such considerations as reservation of the property for government uses, long-standing traditions or practices of using such properties for public expression, intentionally opening of otherwise closed properties to public uses, and the expectations of public regarding a right of access to the property.

The first category, the traditional public forum, consists of "places which by long tradition or by government fiat have been devoted to assembly and debate[,]" including such familiar archetypes as "streets and parks" and sidewalks. Perry, 460 U.S. at 45.

The second category, the designated or opened public forum, consists "of public property which the State has opened for use by the public as a place for expressive activity[,]" including, for example, "university meeting facilities[,]" "school board meeting[s,]" and "municipal theater[s.]" Perry, 460 U.S. at 45.

The third category, the closed or nonpublic forum, consists of "[p]ublic property which is not by tradition or designation a forum for public communication[,]" including military bases, mailboxes, and jail-houses. Perry, 460 U.S. at 46; Greer v. Spock, 424 U.S. 828 (1976); United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114 (1981); Adderley v. Florida, 385 U.S. 39 (1966).

In this case, the irrefutable conclusion is that Lafayette Park is a traditional public forum

property.   The Supreme Court has explained, "[S]treets, sidewalks, and parks, are considered,

without more, to be public forums [sic]."  Grace, 461 U.S. at (and cases cited). Moreover, it is well

settled that:

> [w]herever the title of streets and parks may rest, they have immemorially been held in trust
> for the use of the public and, time out of mind, have been used for purposes of assembly,
> communicating thoughts between citizens, and discussing public questions. Such use of the
> streets and public places has, from ancient times, been a part of the privileges, immunities,
> rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515 (1939) (plurality opinion).

    c.  REVOCATION OF THE "DEEMED GRANTED" PERMITS, AND
         MOLESTATION, INTERFERENCE WITH, AND SUPPRESSION
         OF THE PLAINTIFFS' PRAYER VIGILS DOES NOT PASS
         SCRUTINY

Two government actions have injured, or threaten to injure, Mahoney and the Christian

Defense Coalition in the exercise of their First Amendment rights: the revocation of the "deemed

granted" permits that Mahoney obtained on August 15, 2002, and the threatened molestation,

interference with, and suppression of the planned prayer vigils, including possible arrest and

prosecution of the plaintiffs if they carry out their planned activities.

In traditional public fora, "the government's ability to permissibly restrict expressive conduct

is very limited."  Grace, 461 U.S. at 177 (citations omitted). This conclusion results from the

constitutional axiom that "[o]ne who is rightfully on a street [or steps] open to the public 'carries

with him there as elsewhere the constitutional right to express his views in an orderly fashion.'"

Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984)

(quoting Jamison v. Texas, 318 U.S. 413, 416 (1943)) (additional citation omitted). In fact,

"[r]egulation of speech activity on governmental property that has been traditionally open to the

public for expressive activity, such as public streets and parks, is examined under strict scrutiny." United States v. Kokinda, 497 U.S. 720, 726 (1990) (plurality).

> (1)   THE MOLESTATION, INTERFERENCE WITH, AND SUPPRESSION OF THE PLANNED PRAYER VIGILS ARE NOT REASONABLE AND DO NOT LEAVE OPEN AMPLE ALTERNATIVE CHANNELS OF COMMUNICATION

To survive scrutiny, even a content-neutral regulation must be reasonable and leave open ample alternative channels of communication.  See Grace, 461 U.S. at 177; Frisby v. Schultz, 487 U.S. 474, 429 (1988) (quoting Perry Education Ass'n, 460 U.S. at 45).  The closure of Lafayette Park to the peaceful, nonviolent, nonthreatening conduct of prayer vigils is not reasonable and does not leave open ample alternative channels of communication.

The closure of Lafayette Park is, which the National Park Service has described as "partial and temporary" but which has lasted for nearly a year, is per se unreasonable.   It is unreasonable because it is without justification according to the law and the Constitution.  Here, no statute or regulation prohibits the plaintiffs' planned activity; in Clark v. Community for Creative Nonviolence, 468 U.S. 288 (1984), for example, the Supreme Court upheld the application of an explicit, promulgated rule prohibiting camping in the National Capitol Region parks.  Thus, even if the defendants could, consonant with the First Amendment, enforce an explicit rule prohibiting prayer vigils in Lafayette Park, that is not what is happening here.  It is simply unreasonable for the defendants to behave toward the plaintiffs' prayer vigils as though they were prohibited by law, when they are simply within a category of expressive activities that are not wanted by the defendants.

Moreover, the year-long "partial and temporary" closure of Lafayette Park to demonstrations and special events like the prayer vigils planned by Mahoney and the Christian Defense Coalition

does not leave open ample alternative channels of communication, as required. See Grace, 461 U.S. at 177, Frisby, 487 U.S. at 429. The defendants may argue that ample alternative channels exist for the prayer vigils because they may be conduct in other nearby locations. It is long since settled, however, that a speaker may not be silenced in one location where he is otherwise permitted to be on the excuse that he may speak elsewhere. See Schneider v. State, 308 U.S. 147, 163 (1939) ("one is not to have the exercise of their liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place").

B.    THE PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR RELIGIOUS FREEDOM CLAIMS

Mahoney and the Christian Defense Coalition are required, in response to their sincere religious beliefs, to conduct the prayer vigils. In faithful pursuit of observance of their religious duties, Mahoney and the Christian Defense Coalition planned and organized prayer vigils.

The defendants have revoked the "deemed granted" permits that Mahoney obtained for the prayer vigils. Without the permits, Mahoney and the Christian Defense Coalition will be subjected to arrest and prosecution if they fail to disperse and number more than 24 in their gathering at Lafayette Park. That revocation, and the arrests and prosecutions that will undoubtedly follow if the Plaintiffs' are not secured by an Order of this Court, has prevented and will continue to prevent the plaintiffs from carrying out their prayer vigil as planned and required by their faith.

In such circumstances, the defendants are required to show that their actions are made necessary by the existence of a compelling government interest and are the least restrictive means of securing those interests. See 42 U.S.C.A. § 2000bb (the Religious Freedom Restoration Act of

1993).[2, 3, 4]

The defendants cannot show a compelling government interest in suppressing the peaceful, nonviolent prayer vigils planned and carried out by Mahoney and the Christian Defense Coalition.

---

2.      That statute provides, in pertinent part:

(a)      IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b)      EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1)      is in furtherance of a compelling governmental interest; and

(2)      is the least restrictive means of furthering that compelling governmental interest.

(c)      JUDICIAL RELIEF.—A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb.  Congress has amended RFRA, when it enacted the Religious Land Use and Institutionalized Persons Act of 2000.  See Public Law 106-274, § 7 (amendment to RFRA).  The effect of that amendment was to clarify the broadly drawn scope of the protections afforded by RFRA.

3.      Although the Supreme Court found that application of the Religious Freedom Restoration Act of 1993 to state and local governments and actors was beyond the authority of Congress, see City of Boerne v. Flores, 521 U.S. 507 (1997), this Circuit has expressed the view that RFRA remains a valid restriction on federal activities and actors.  See Henderson v. Kennedy, 265 F.3d 1072, 1073 (D.C. Cir. 2001).

4.      Analysis of the plaintiffs' Free Exercise Claim — because it reflects one of those instances noted by Justice Scalia in Employment Div. v. Smith, 494 U.S. 872, 881-82 (1990) in which a Free Exercise right is conjoined with an exercise of the rights to freedom of speech — still proceeds along the pre-Smith analysis.  For this reason, analysis of the plaintiffs' Free Exercise Claim is identical to their Religious Freedom Restoration Act claim.

The assertion of risks to security and safety of the White House complex are insufficient, because

the ipse dixit of placing a government building in proximity to a public forum does not justify the

destruction of the public forum status of the property.  See United States v. Grace, 461 U.S. 171,

180-81 (1983).  In fact, the D.C. Circuit has spoken quite directly and precisely to this point, in prior

litigation between Mahoney and the National Park Service:

> In Henderson v. Lujan, 296 U.S. App. D.C. 58, 964 F.2d 1179, 1181 (D.C. Cir. 1992), a federal agency, in fact NPS, sought to delete a segment of the sidewalks abutting Constitution Avenue from the category of public forum by first declaring those sidewalks to be within the official boundaries of the Viet Nam Memorial and then banning "the sale or distribution of newspapers, leaflets, and pamphlets" in the entire area so designated. We rejected the government's attempt, holding that the sidewalks at issue in that case were "classic instances" of public forum sidewalks. 964 F.2d at 1182. We noted that they were "physically indistinguishable from [other] sidewalks used for the full gamut of urban walking." Id. We further concluded that our decision followed from the Supreme Court's decision in Grace, which rejected as unconstitutional a ban on picketing and leafletting on the sidewalks abutting the property of the Supreme Court itself, holding that the government could not "transform the character of property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property." 461 U.S. at 180. As the Supreme Court had earlier noted in language perhaps even more pertinent to the present case, the government "may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums." United States Postal Service v. Council of Greenburgh Civic Ass'n, 453 U.S. 114, 133, 69 L. Ed. 2d 517, 101 S. Ct. 2676 (1981).

> Neither will we permit the government to destroy the public forum character of the sidewalks along Pennsylvania Avenue by the ipse dixit act of declaring itself a permittee. We do not purport to hold that the government can never control the use of segments of its own property against actual inconsistent usage by persons attempting First Amendment expression. In Grace, the Supreme Court reiterated its "regular[ ] rejection" of "the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" 461 U.S. at 177-78 (quoting Adderley v. Florida, 385 U.S. 39, 47-48, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966)). But the Grace Court went on to note, as the Adderley Court had previously recognized, that the government's power over the property under its control is to preserve it "for the use to which it is lawfully dedicated." Id. By way of example, in Adderley, the Court upheld the arrest of

demonstrators who would have blocked the necessary flow of traffic in and out of a Florida jail. Here, the dedicated use of the property in question is as a sidewalk--a quintessentially public forum. Its use on the date on which appellants sought to exercise their First Amendment rights was not only as a forum as public as ever, but if anything more so. The event in question was the observance of the inauguration of the Chief Executive of the United States, an event less private than almost anything else conceivable. NPS, however, even more overassertive of its authority and overprotective of the property under its protection than in Henderson, issued itself a permit not for a limited segment of the Pennsylvania Avenue sidewalks for the time of the Parade, but for the entire length of Pennsylvania Avenue sidewalks for a five-month period, a time frame more than twenty times as long as permitted under its own regulation. There can be no doubt that the standard of narrow tailoring to meet a compelling state interest applies and has been violated.

Mahoney v. Babbitt, 105 F.3d 1452, 1457-58 (D.C. Cir. 1997).

The suppression of the plaintiffs' prayer vigils is not the least restrictive means for serving any putatively compelling government interest. This conclusion is confirmed by the fact that although the permits for the prayer vigils have been revoked, and the National Park Service will enforce the restrictions related to conduct of demonstrations without a permit against Mahoney and the Christian Defense Coalition, Lafayette Park remains open for pedestrian traffic and tourist visits and the other activities that have occurred on it, as well as the demonstration activities of small groups. It strains credulity for the defendants to assert that a threat to safety and security exists when they have not taken any steps to close Lafayette Park to everyone. In addition, the flat ban on demonstrations and special events in Lafayette Park could not be the least restrictive alternative when the National Park Service has not even offered to work with Reverend Mahoney on the location within the Park as a means of accommodating the planned vigils by placement within Lafayette Park. The defendants have simply refused to consider any alternative less restrictive than complete denial, even though such alternatives were readily available. Because permit revocation, molestation, interference with, and suppression of the prayer vigils are not the least restrictive means

of serving any putatively compelling government interest, the plaintiffs are likely to prevail on the RFRA and Free Exercise Claims in their Verified Complaint.

> C.   THE PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR ADMINISTRATIVE PROCEDURES ACT CLAIM

The National Park Service has, upon occasion, engaged in substantive rulemaking under the guise of making a technical interpretation of one of its rules. See United States v. Picciotto, 875 F.2d 345 (D.C. Cir. 1989). The advantage to the National Park Service is avoidance of messy, republican values like consultation with the governed through the process of notice and comment rule-making. But here, as in Picciotto, the National Park Service has failed to comply with the requirements of the APA by proceeding according to the standards of notice and comment. There is little doubt that Plaintiffs will prevail on their claim that the substitution of the National Park Service's "Notice" that Lafayette Park would be closed "partial[ly] and temporar[ily]" for up to a year (or even longer) fails to comport with the requirements of the APA.

> D.   THE PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM OF VIOLATION OF THE IMPLIED RIGHT TO EQUAL PROTECTION

Although the National Park Service has revoked Mahoney's "deemed granted" permits, Lafayette Park continues to be available for use by others, including persons who were passing up and down along Pennsylvania Avenue, in the City of Washington, as well as tourists, and at least one demonstration by a group involving fewer than 25 participants.

The assertion of safety or security interests to bar the plaintiffs' prayer vigil embodies a form of an unlawful discrimination by the defendants because, although similar or identical safety or security concerns have been present, the defendants have not closed Lafayette Park to the many other uses to which it has normally been put, particularly pedestrian and tourist traffic. To survive

scrutiny, the defendants' actions, because they burden the exercise of fundamental rights of speech and of religion, are subject to strict scrutiny. See Plyler v. Doe, 457 U.S. 202, 216-17 (1982); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670 (1966).

The United States Court of Appeals for the District of Columbia Circuit has explained the relevant standard:

> "[U]nder a strict scrutiny standard, a fundamental right is implicated and the [government] would have to show that the [regulation] is narrowly tailored to promote a compelling governmental interest. See Plyler v. Doe, 457 U.S. 202, 216-17, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982). To be narrowly tailored, there must be a sufficient nexus between the compelling governmental interest and the provisions of the Act, see City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 721-22, 102 L.Ed.2d 854 (1989), and the Act must use the least restrictive reasonable means to achieve its goals, see Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003-04, 31 L.Ed.2d 274 (1972)."

Hutchins v. The District of Columbia, 144 F.3d 798, 805 (D.C. Cir. 1998). The plaintiffs are likely to prevail on their implied Equal Protection claim because the molestation, interference with, and suppression of the prayer vigils is not justified by any compelling government interest. The interest that the defendants may assert, safety and security of the White House complex and persons passing in its vicinity, has been shown by the defendants' disparate favoritism for pedestrian traffic uses of the Park not to require that the banning of peaceful, nonviolent prayer vigils. Moreover, the defendants' actions are not justified as the least restrictive means available to secure any appropriate government interest. Several less restrictive alternatives have already been identified in this Memorandum, including placement within the Park of the activity, or the like. That, and perhaps other alternatives, demonstrate that suppression of the prayer vigils is not necessary.

III.   **MAHONEY AND THE CHRISTIAN DEFENSE COALITION HAS SUFFERED IRREPARABLE INJURY, AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY, ABSENT INJUNCTIVE RELIEF**

Mahoney and the Christian Defense Coalition seek to engage in a protected form of expression on a traditional public forum property, and have been prevented from doing so by the action of federal government agencies and their employees.  Their injuries are classic deprivations of First Amendment rights.

Even the momentary loss of these freedoms is irreparable.  Loss of a First Amendment right is irreparable because it is an injury that cannot be fully compensated by later damages.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976);  New York Times Co. v. United States, 403 U.S. 713 (1971);  White House Vigil for the ERA Comm. v. Watt, 717 F.2d 568 (D.C. Cir.1983);  A Quaker Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C. Cir.1969);  Waters v. Barry, 711 F. Supp. 1121, 1123 (D.D.C. 1989); Community for Creative Non-Violence v. Carvino,  648 F. Supp. 476, 479 (D.D.C.), rev'd on other grounds sub nom. Community for Creative Nonviolence v. Kerrigan, 865 F.2d 382 (D.C. Cir.1989).

IV.   **THE GOVERNMENT WILL NOT BE HARMED BY THE ISSUANCE OF INJUNCTIVE RELIEF**

The Government will not suffer any harm from the issuance of the requested temporary restraining order.  If the Temporary Restraining Order issues in the form requested, the Government will be compelled to tolerate peaceful, nonviolent, prayer vigils conducted in Lafayette Park.  The Government will not suffer any injury in being ordered by the Court, pending the hearing on Mahoney and the Christian Defense Coalition's request for a preliminary injunction, not to enforce the unconstitutional burden it has imposed on Mahoney and the Christian Defense Coalition's

constitutional and statutory rights. Nor does the Government have an injury of which it may fairly complain in being ordered not to enforce a discriminatory and unauthorized closure of a traditional public forum sidewalk. See Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997).

V.    **THE PUBLIC INTEREST WILL BE ADVANCED, NOT HARMED, BY THE ISSUANCE OF INJUNCTIVE RELIEF IN THIS CASE**

Faced with unspecified and unexplained assertions by government agencies of danger to security, Reverend Mahoney is confident, nonetheless, that the public interest will be served by granting the Temporary Restraining Order, and will be injured by the failure to do so. History agrees with Reverend Mahoney:

> The loss of liberty in general would soon follow the suppression of the liberty of
> the press; for as it is an essential branch of liberty, so perhaps it is the best preservation of the whole. Even a restraint of the press would have a fatal influence. No nation ancient or modern ever lost the liberty of freely speaking, writing, or publishing their sentiments but forthwith lost their liberty in general and became slaves. LIBERTY and SLAVERY! how amiable is one! how odious and abominable the other! Liberty is universal redemption, joy, and happiness; but servitude is absolute reprobation and everlasting perdition in politics.

John Peter Zenger, "The New York Weekly Journal" at 1 (Nov. 17, 1733 ed).[5]

The public interest lies with the vindication of the federal constitutional and statutory rights of the plaintiffs. The constitutionally protected prayer activities of the plaintiffs certainly are at stake, and the plaintiffs are distressed about the possible loss of those rights. But there are larger issues at stake. Unsurprisingly, citizens expect that federal governmental agencies will be

---

5.    The text of the article by John Peter Zenger is reproduced as part of the Famous Trials Website maintained by Professor Douglas O. Linder, at the School of Law at the University of Missouri, Kansas City.   The complete text of Zenger's commentary is available at http://www.law.umkc.edu/faculty/projects/ftrials/zenger/journalissues3.html

familiar with binding constitutional principles and will adhere to them and will fully respect constitutionally ordered rights. Undoubtedly, preventing governmental abuses of the right to free exercise of religion, the right to freedom of speech, the right to peaceable assembly, the right to due process, and the right to equal protection of the law, advances the public interest.

DATED: August 28, 2002.

Respectfully submitted,

_____

James Matthew Henderson Sr. # 452639
  *Counsel of Record*
The American Center for Law and Justice
205 Third Street SE
Washington, DC  20003
(202) 546-8890
(202) 337-3167 (fax)
JMHenderson@aclj-dc.org
*Attorney for the Plaintiffs*