UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| REVEREND PATRICK MAHONEY<br>4019 Duke of Gloucester<br>Fredericksburg, VA<br><br>and<br><br>THE CHRISTIAN DEFENSE COALITION,<br>4019 Duke of Gloucester<br>Fredericksburg, VA | ) |
| v. | ) Civ. No. 02-1715 (GK) |
| GALE NORTON<br>Secretary of the United States<br>Department of Interior<br>1849 C Street NW<br>Room 6151<br>Washington, DC 20240<br><br>and<br><br>NATIONAL PARK SERVICE<br>1849 C Street NW<br>Washington, DC 20240 | ) |

<u>OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER</u>

Defendants, Gale Norton, Secretary of the United States Department of Interior, and the National Park Service, hereinafter Defendants, hereby oppose plaintiffs' motion for a temporary restraining order with regard to the plaintiffs' planned prayer vigils in Lafayette Park for August 30 and September 11, 2002. Because the United States Secret Service specifically requested the National Park Service, by letters dated July 29, 2002. and August 14, 2002, to restrict temporarily large group permitted activity in Lafayette

Park, as well as in other areas, and because of current security concerns for the safety of the White House, its occupants, other Secret Service protectees, and the public in the area of the White House. NPS's revocation of the deemed granted applications for prayer vigils in Lafayette Park constitute reasonable restrictions on the time, place and manner of speech and do not violate the plaintiffs' constitutional rights nor any rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb (RFRA) or the Administrative Procedures Act, 5 U.S.C. § 702, et seq.(APA).[1]

**I. Background**

Plaintiffs have applied for permits for demonstrations (prayer vigils) to occur on August 30, 2002 and September 11, 2002, at Lafayette Park, National Park land located adjacent to the White House. See Map, Exhibit A.

Since the terrorist attacks on September 11, 2001, the United States Secret Service requested that the National Park Service impose a partial and temporary public use limitation, and not issue permits for demonstrations and special events for Lafayette Park,

---

[1] We note that plaintiff Christian Defense Coalition ("the Coalition") has failed to demonstrate that it has standing to bring these claims. In order to demonstrate "associational" or "representational" standing, the Coalition must demonstrate "that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" National Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1435 (D.C. Cir. 1995); quoting Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977). The Coalition lacks standing for the simple reason that it apparently has no members. See Complaint, ¶ 6 (the Coalition "is an unincorporated religious association"). Accordingly, all of the Coalition's claims should be dismissed for lack of standing.

the White House sidewalk, and the Ellipse for thirty days. See Declaration of Richard Merryman, Exhibit B, at ¶ 34. Since then, the Secret Service has, after reviewing current facts, renewed its request on a regular basis for the White House sidewalk and Lafayette Park but not for the Ellipse. Id.

In response, pursuant to 36 C.F.R. §1.5, the National Park Service decided to impose a public use limitation and not issue permits for demonstrations and special events. Id., at ¶ 35. Consistent with its Record of Determinations, the Park Service has not issued any demonstration or special event permits for the affected areas. Permissible "small group demonstration" involving 25 persons or fewer, may and are still occurring in Lafayette Park and the White House sidewalk. Id.

A copy of the National Park Service most recent Record of Determination dated August 19 and July 30, 2002 and the United States Secret Service requests dated July 30, 2002 and August 14, 2002 are marked as Enclosure 1 to the Declaration of Richard Merryman, Exhibit B.

On August 14, 2002, the Christian Defense Coalition submitted applications 02-1587 and 02-1588, seeking permits to demonstrate in Lafayette Park with 40 participants on August 30, and with 500 participants on September 11, 2002. Their applications are attached to Exhibit B as Enclosure 2.

On August 20, 2002, the National Park Service informed the Christian Defense Coalition in writing that their "deemed granted" applications for Lafayette Park must be

revoked for security reasons pursuant to 36 C.F.R. § 7.96(g). A copy of the denial letter is provided with the Declaration of Richard Merryman as Enclosure 3.

The Park Service explained in its denial letter:

> We regret that the "deemed granted" applications for Lafayette Park must be revoked for security reasons pursuant to 36 C.F.R. § 7.96(g). Instead, we herein identify several other proposed locations for your proposed demonstrations, all within a very short distance of your proposed location. On July 30, 2002 the United States Secret Service requested that the National Park Service extend the partial and temporary public use limitation through September 1, 2002 and not issue permits for Lafayette Park. And on August 14, 2002 the United States Secret Service requested that the National Park Service extend the partial and temporary public use limitation through October 1, 2002 and not issue permits for Lafayette Park. This extension is to ensure necessary security and safety for the adjacent White House complex, its occupants, and the public. Therefore, pursuant to 36 C.F.R. § 1.5, the National Park Service decided to impose a public use limitation. A copy of the Secret Service's requests and the National Park Service's Records of Determination are enclosed for your ready reference. These public use limitations are intended to ensure necessary security and safety for the adjacent White House complex, its occupants, and the public. They have neither the effect nor intent to prevent the exercise of First Amendment rights. Activities in Lafayette Park that do not require a permit--such as a demonstration involving 25 persons or fewer--are not affected. In addition, other Federal parks are available for permit and non-permit events. In that regard, pursuant to 36 C.F.R. § 7.96(g)(4)(iii)(C), we hereby propose several alternative park sites for your proposed demonstration. Specifically, we suggest that you consider the use of portions of the Ellipse which is just south of the White House or McPherson and Farragut Squares which are just one block north of Lafayette Park. Indeed, these alternative areas have been successfully used by groups who were denied permits in the past due to the Secret Service security request. You may also wish to consider contacting the District of Columbia or the United States Capitol Police regarding the use of public spaces under their jurisdiction.

Exhibit B, Enclosure 3.

Other groups have been denied permits for Lafayette Park or the White House sidewalk but have had successful permitted demonstrations at other nearby alternative park locations. Exhibit B at ¶ 39.

Consistent the letter dated August 20, 2002, the National Park Service offered other areas as alternative locations for plaintiffs' permits. Id. at ¶ 40. Portions of the Ellipse, which is just south of the White House, and McPherson and Farragut Squares which are just one block north of Lafayette Park, currently remain available. Further, activities that do not require a permit--such as a permissible "small group demonstration" involving 25 persons or fewer--are not affected and may still occur in Lafayette Park. Id. As plaintiffs themselves noted, the Reverend Mahoney has participated in such small group demonstrations as recently as this month. Compl. at ¶ 32.

The National Park Service took the action of revoking the deemed granted permits based on the request of the Secret Service. See Enclosure 1 to Merryman Decl. The Secret Service, under Title 18, United States Code, Section 3056, is charged with protecting the President, Vice President, the President-elect and the Vice President-elect, as well as the immediate families of those individuals. Pursuant to Title 3, United States Code, Section 202, the Secret Service Uniformed Division assists the Director of the Secret Service in protecting the President, the Vice President, members of the immediate families of the President and the Vice President, the White House, any building in which Presidential offices are located, the Treasury Building and grounds, and other designated

locations and individuals. Declaration of Eric Harnischfleger, Deputy Assistant Director, Office of Protective Services, United States Secret Service, Exhibit C, at ¶ 5. The Secret Service both designs and implements the security plan for the President, the Vice President, their families and other protectees, as well as for White House complex. Id. at ¶6. In order to develop the most effective security plans possible, the Secret Service continuously looks to enhance its security measures and takes into account past occurrences as well as current conditions. Id. In evaluating the White House security plan, the Secret Service considers many potential threats, including but not limited to terrorist attacks, lone gunmen, fire safety, environmental hazards, chem/bio attack, medical concerns, and structural safety issues. Id.

The security measures advocated by the Secret Service have not remained static since September 11, 2001. Changes have been made as deemed necessary. For example, after the terrorist attacks on the World Trade Center and the Pentagon, the Secret Service expanded the White House security perimeter by closing 15th and 17th Streets, N.W. near the White House complex, closing Lafayette Park, the White House sidewalk and the Ellipse to the public, and cancelling all public tours of the White House. Id. at ¶ 7. After September 11, 2001, Lafayette Park, the White House sidewalk and the Ellipse have been open to members of the general public. Several new security measures, however, including truck restrictions on 17th Street, have been implemented in and around the White House. Id. at ¶ 8. These changes are intended to minimize the risk posed to the

White House complex, its occupants and the members of the public who visit the White House from the possibility of an attack on the western side of the complex. Id.

On September 24, 2001, the Office of Protective Operations sent the first of a series of letters to the National Park Service asking the National Park Service not to issue demonstration or special event permits for Lafayette Park, the Ellipse, and the area known as the White House Sidewalk for a period of 30 days. Id. at ¶11.

After September 11, 2001, public tours of the White House tours were temporarily eliminated and have been restricted. Harnischfleger at Id. Currently, only school groups sponsored by a member of Congress or special invitees may tour the building. Id. These individuals are subjected to additional advance scrutiny and screened individually. Public tours were eliminated because of the threat posed by unknown individuals inside the White House as well as the threat inherent in the long line of people who typically waited for tickets to the public tours. Id. The Secret Service determined that the long line of people waiting for entrance to the White House, which often lasted for hours, could be an attractive target for terrorist activity and constituted a threat to public safety. Id.

The Secret Service has also requested the National Park Service and the Metropolitan Police Department to temporarily deny permits for special events, demonstrations, parades or marches in areas adjacent to the White House complex since September 11, 2001. Id. at ¶¶ 10, 12. These requests are issued on a monthly basis in order to allow continuous re-evaluation of the necessity and effectiveness of the

restrictions and to act appropriately. Id. at ¶ 10. The Secret Service specifically considered the public interest in accessing these areas. Id. at ¶ 16, see also, letter of August 14, 2002. Moreover, when the restrictions can be lifted the Secret Service is committed to do so. Id.

The necessity of limiting large group activity in Lafayette park is based on the ability of the Secret Service to observe and detect individuals who may either constitute an immediate threat or be preparing for a future threat against the White House. Harnischfleger at ¶ ¶13-15. It is absolutely critical that the Secret Service be able to quickly and efficiently evacuate the White House complex. Id. at ¶ 15. The presence of large groups in and around the White House could well hinder the effective evacuation of the buildings within the complex. Id. Additionally, a threat to the White House could, for public safety reasons, require the immediate evacuation of the public from Lafayette Park and the White House sidewalk area. Id. The presence of large groups could make this more difficult and require manpower that could well be needed elsewhere. Id.

Since the initial request in September, 2001, the Secret Service has continuously monitored the threat level to the White House, and, bearing in mind the significant public interest in accessing these areas for speech and special event activity, has made adjustments accordingly. Id. at ¶ 16. In December, 2001, the Secret Service did not request that permits be denied for the Ellipse and has not made a request since. Id. In evaluating the risks posed by groups in the Ellipse, the Secret Service has repeatedly

considered the fact that the Ellipse is farther away from the White House than is Lafayette Park. Id. This greater distance affords more protection for the White House from possible attack from the Ellipse as well as more protection for the public should the White House be attacked. Id. Accordingly, the Ellipse is now available for special event and demonstration activity. Id.

In support of the Secret Service decision to request the National Park Service to deny or revoke special event and demonstration activity permits for August and September, 2002, classified information relied upon is available to the Court setting forth some of the pertinent intelligence information received regarding threats to the President and the White House complex. This information has been properly classified pursuant to Executive Order 12,958 (1995).

In making the request of the National Park Service and the Metropolitan Police Department regarding permitting for large groups in and around the White House complex, the Secret Service considered the available alternatives, and determined that the temporary requests will allow the public to express their views or hold special events in areas near the White House without compromising security. Id. at ¶ 16.

## II. LEGAL STANDARDS

It is well settled that preliminary injunctive relief is an extraordinary remedy, and the party seeking it has a substantial burden of proof. American Coastal Line Joint Venture v. United States Lines. Inc., 580 F. Supp. 932, 935 (D.D.C. 1983). See, e.g.,

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958). To be entitled to the extraordinary remedy of preliminary injunctive relief, a plaintiff must meet this strict burden by showing that: (1) there is a substantial likelihood of prevailing on the merits of his claim, (2) a preliminary injunction is necessary to prevent him from suffering irreparable injury, (3) the threatened injury to the plaintiff outweighs the possible harm to others, and (4) the public interest favors issuance of the injunction. Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Virginia Petroleum Jobbers Association, 259 F.2d at 924-925. "The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Wisconsin Gas Co., 758 F.2d at 674. To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." Id. Although the loss of First Amendment rights, even for a minimal period, may constitute irreparable injury, plaintiff is still required to demonstrate that First Amendment rights are threatened or are in fact being impaired at the time relief is sought. National Treasury Employees Union v. United States, 927 F.2d 1253, 1256 (D.C. Cir. 1991).

Under the foregoing, plaintiffs are plainly not entitled to preliminary injunctive relief. Not only have they failed to demonstrate a substantial likelihood of success on the merits, but they have also failed to show the existence of any irreparable harm or that

granting preliminary relief will serve the public interest and not harm other parties. Consequently, as demonstrated below, their motion should be denied.

Plaintiffs allege that they wish to conduct a prayer vigil on August 30, 2002, and another on September 11, 2002. They argue that unless the revocation of their permits is cancelled, they may be arrested for engaging in protected First Amendment activity. The area in which plaintiffs desire to demonstrate is encompassed within Lafayette Park, which is currently under the security restrictions requested by the Secret Service. While Lafayette Park is generally considered a public forum, the decision of the Secret Service to prohibit large scale demonstrations or gatherings in Lafayette Park on a temporary basis pending the resolution of current security concerns constitutes a reasonable time, place and manner restriction. The decision is content neutral, in that <u>no</u> groups over 25 individuals have been permitted for Lafayette Park regardless of the stated intent of their of their permit request. Content neutral regulations and decisions are not subject to the strict scrutiny of content oriented restrictions. <u>See</u>, <u>e.g., Turner Broadcasting Systems v. FCC</u>, 512 U.S. 622 (1994).

Thus, because the government decision at issue is content neutral, and narrowly tailored to achieve significant government interests, no plaintiffs' First Amendment rights will be violated by enforcement of the regulation. Because the decision is content neutral, plaintiffs cannot demonstrate a violation of RFRA. Because no other similarly situated groups are treated in a different manner, plaintiffs' equal protection claim cannot succeed.

Finally, because the actions of the NPS are permitted under the applicable regulations which were appropriately promulgated under the APA, the plaintiffs' claim that the restriction violates the APA also fails.

Plaintiffs cannot show a substantial likelihood of success on the merits of their claims or that they will be irreparably injured if they are not allowed to demonstrate in Lafayette Park. To the contrary, allowing demonstrators like plaintiffs into these areas will harm the interests of federal defendants and be a disservice to the public interest, because of the interference with legitimate security actions in and around Lafayette Park for the purpose of protecting the White House, its occupants and visitors and the public.

**III. Plaintiffs Are Not Entitled to Injunctive Relief**

The premise of plaintiffs' argument appears to be an assertion that they have a First Amendment right to demonstrate whenever, wherever, and however they desire. But the Supreme Court has consistently rejected that argument. Otherwise, the temporary and modest limits on demonstrations constitute reasonable time, place, or manner limitations that comfortably pass First Amendment muster. The security measures, addressed to all would-be large group demonstrators, are not directed at any particular group or individual but are being imposed for legitimate security reasons. As the declaration of Deputy Assistant Director of the Secret Service, Eric Harnischfeger (Exhibit C) establishes, the heightened security around the White House is imposed as a result of the increased security concerns regarding the White House, the President and the members of the public

after the terrorist attacks of September 11, 2001 and based on current and ongoing threats. Exhibit C. Because the limits are constitutional and grounded on security concerns, plaintiffs are unlikely to succeed on the merits.

In the second place, plaintiffs have failed to show that they will suffer irreparable harm if the injunction is denied. They have demonstration permits at the Ellipse, which is in sight of the White House and the Washington Monument, is well traveled by tourists and others for whom the demonstrators may wish to perform, and is comparable to the location of Lafayette Park. The Ellipse, in fact, has been used successfully by other groups denied access to Lafayette Park, see Exhibit B at ¶ 39. Plaintiffs have not articulated any basis for believing that the Ellipse is not comparable and they do not even seriously attempt to do so, arguing instead that they have the right to protest wherever they want just because they want to be in that particular location. See Plaintiffs' Memorandum at 6-7. At the Ellipse or one of the other alternative sites proposed to the plaintiffs, they will be free to exercise their First Amendment rights. The modest limit on location, constitutionally permissible, simply fails to create any irreparable harm for plaintiffs.

Finally, plaintiffs have failed to show that if the injunction were issued, there would be no harm to other parties, and it would serve the public interest. As our Court of Appeals has held, the security of the President is a matter of obvious public interest. Consequently, this Court should deny plaintiffs' motion for preliminary injunction.

**A. Permit Restrictions at Lafayette Park Do Not Violate Plaintiffs' First Amendment Rights**

It is well-established that the right to express ideas is not wholly unfettered. Thus, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). Similarly, it is beyond dispute that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense and Educational Fund Inc., 473 U.S. 788, 800 (1985). As the Supreme Court put it : "We have regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." United States v. Grace, 461 U.S. 171, 177-178 (1983)(internal quotation marks omitted). Thus, the government may in appropriate circumstances place reasonable restrictions on the time, place or manner of protected speech, so long as ample alternative means of communication are left open. See also, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789 (1984) [Taxpayers for Vincent]; Heffron, 452 U.S. at 647-48; ISKCON v. Kennedy, 61 F.3d 949, 955 (D.C. Cir. 1995).

Importantly, "under the Free Speech clause 'religious organizations [do not] enjoy

rights to communicate . . . superior to those of other organizations having social, political, or other ideological messages to proselytize." ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949, 958 (D.C. Cir. 1995), quoting Heffron, 452 U.S. at 652-53 (editing by the court).

In Clark v. Community for Creative Non-Violence, 468 U.S. 288 (1983), a case which challenged the National Park Service's camping regulation for Lafayette Park, the Supreme Court set out the test for a regulation that impacts speech in a traditional public forum:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Clark, 468 U.S. at 293-294 (citations omitted).

The Supreme Court and our Court of Appeals have both recognized that the government is entitled to deference in making judgments such as those involved here. Clark, 468 U.S. at 299; Board of Trustees of the State Univ. of New York v. Fox, 492 U.S. 469, 478 (1989); Kerrigan, 865 F.2d at 390; Juluke v. Hodel, 811 F.2d 1553, 1560 (D.C. Cir. 1987). Thus, in determining whether a regulation that impacts speech is narrowly tailored, courts "'have been loath to second-guess the Government's judgment to that effect.'" American Library Association v. Reno, 33 F.3d 78, 88 (D.C. Cir. 1994), cert. denied, 515 U.S. 1158 (1995), quoting Board of Trustees of the State Univ. of New

York, 492 U.S. at 478.

Here, the Secret Service has determined that large crowds gathered within a short distance of the White House, during the period of increased threat to that area and its occupants, threaten the safety and security of White House personnel, visitors, government employees, demonstrators, and pedestrians.

In order to advance the security interests involved, the Secret Service, has therefore, requested a temporary restriction on large groups gathering within the White House complex, including Lafayette Park, a restriction which is continually reviewed and changed when circumstances permit. Harnischfleger Decl. at ¶ 16. This restriction targets precisely the security issues identified while leaving available a host of alternative channels for communication, including not only other locations nearby but also use of Lafayette Park itself, if the numbers of individuals participating do not number more than 25 at any given moment.

**1. The Secret Service and NPS decision is Content Neutral**

When deciding whether a speech restriction is content-based or content-neutral, "[t]he government's purpose is the controlling consideration." Ward, 491 U.S. at 791; see also id. (content neutrality turns on, inter alia, whether a speech restriction is "justified without reference to the content of the regulated speech") (internal quotation marks and

citations omitted) (emphasis deleted).[2] The "fundamental principle" underlying the concern about content-based speech regulations is "that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" Renton, 475 U.S. at 48-49 (citation omitted).

Here, there can be no serious question about whether or not the restriction requested by the Secret Service is content neutral. The government's purpose is to protect the safety and security of White House personnel, visitors, demonstrators and pedestrians, Treasury Department personnel and others in the immediate vicinity of the White House. This has absolutely nothing to do with content and the restriction applies to all groups wishing to demonstrate in a group larger than 25 individuals regardless of their identity or content of their message.

**2. The Restriction Is Narrowly Tailored to Serve Significant Government Interests**

Plaintiff's appear to argue that because they do not pose a threat, the restriction of location is impermissible. This argument does not overcome the legitimate restriction on

[2] The complaint by plaintiffs appears to argue that the permits at issue in this case are revoked for some reason relating to the status of the Reverend Mahoney and his organization as a religious organization. There is no indication whatsoever that the character of Reverend Mahoney's group or its proposed activity is the basis for the restriction. Because no other group, including no non-religious groups, has been granted a permit in defiance of the Secret Service request that such permits be denied, the Court need not consider this argument further.

large groups which create the security concerns described in the Harnschfleger Declaration, Exhibit B, ¶¶ 13-15, without regard to the intent of the principals. This argument ignores the well-settled principle that "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." Ward, 491 U.S. at 781; accord Clark, 468 U.S. at 296-97; Heffron, 452 U.S. 652. See also White House Vigil, 746 F.2d 1534 n.106 ("There is no suggestion, of course, that appellees or intervenors themselves would engage in activity that threatens the White House or its occupants. . . . We are concerned instead with persons who harbor less beneficient intentions.")

Our Court of Appeals has explained that "a regulation will meet the Supreme Court's 'narrowly tailored' requirement if a substantial portion of the burden it imposes furthers the Government's interest, even though a less intrusive alternative might also exist." American Library Association, 33 F.3d at 88. Accord, White House Vigil, 746 F. 2d (limitation should be upheld as long as it is in a zone of constitutionality). Applying this standard to the demonstration permit limitations requested by the Secret Service demonstrates that it is narrowly tailored. As discussed above, courts "have been loath to second-guess the Government's judgment [that a regulation is narrowly tailored]." Board of Trustees of the State Univ. of New York, 492 U.S. at 478.

**3. Plaintiffs have Ample Alternative Channels of Communication**

There is really no dispute in this case that plaintiffs have open, ample alternative channels of communication. Plaintiffs can pray, chant, sing, picket, carry signs, leaflet, and make speeches at the Ellipse or other Park grounds without difficulty. They can do so within sight of the White House and other important national symbols, such as the Washington Monument. A group of less than 25 plaintiffs may conduct thier vigil in Lafayette Park. Plaintiffs fail utterly to articulate any reason why these alternative locations are not suitable for their purposes. [3]

Because the restriction on demonstrations in Lafayette Park is content neutral, narrowly tailored to serve several significant and well-recognized government interests and leaves open ample alternative channels for communication, it satisfies the First Amendment and should be upheld by this Court.

**B. Plaintiffs' Allegations Fail to State a Claim Under the Religious Freedom Restoration Act.**

In order to state a claim under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, plaintiffs have the burden of alleging facts that demonstrate that a sincerely held religious belief is at stake, and that the government action at issue

---

[3] Even if for some unexplained reason plaintiffs believe that Lafayette Park will better allow them to communicate their message than the Ellipse or other locations, that does not overcome the government's legitimate restriction in that Park. See Vietnam Veterans Against the War v. Morton, 506 F.2d 53, 58 n.14 (D.C. Cir. 1974) (First Amendment does not compel government "to permit the most effective means of expression chosen by the citizen").

substantially burdens that belief. See Werner v. McCotter, 49 F.3d 1476, 1480 and n.2 (10th Cir. 1995), cert. denied, 520 U.S. 1244 (1997). Mere conclusory allegations are not enough to carry that burden. "[A] court must accept only well-pleaded allegations of fact, it need not 'accept "legal conclusions."'" Taiwo Okusami v. Psychiatric Institute of Washington, Inc., 959 F.2d 1062, 1069 (D.C. Cir. 1992), (Sentelle, J., concurring in part and dissenting in part) quoting 5A Wright & Miller, Federal Practice and Procedure, § 1357, at 315; see also Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Here, Reverend Mahoney alleges that his "religious faith" demands that he engage in prayer vigils for the government of the United States and others. Compl. at ¶¶ 8-9. He further alleges that he needs to pray in Lafayette Park because it is an “important core” park, id. at 34, and that “many important social, political, and religious demonstrations and protests have taken place in Lafayette Park.” Compl at ¶ 35.

As pled by the plaintiffs, then, the only impact that the restriction has on the pursuit of their cause is extremely narrow: they may not congregate in groups larger than 25 in Lafayette Park. Thus, plaintiffs have not alleged facts demonstrating that their sincerely held religious beliefs are substantially impacted by the demonstration restriction. Accordingly, plaintiffs fail to state a claim under RFRA.

**C. Plaintiffs' Equal Protection Claim Lacks Merit**

In order to state an equal protection[4] claim, the plaintiffs must show that the government has failed to "afford similar treatment to similarly situated persons." News America Pub., Inc. v. FCC, 844 F.2d 800, 8094 (D.C. Cir. 1988) (emphasis added). The lack of similarity between the plaintiffs' revoked permits and the ability of others to use Lafayette Park in groups less than 25 makes plaintiffs' equal protection claim properly subject to summary dismissal.

Plaintiffs apparently claim that because Lafayette Park has not been closed to groups under 25 individuals, their equal protection rights have been violated by the restriction on permits for groups over that number. The restriction, however, is a valid time, place and manner restriction in light of the important governmental objective of keeping the area and its inhabitants and visitors secure.

Unless a classification burdens a suspect class or a fundamental right, "it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 457-58 (1988). Such classifications have a "strong presumption of validity." Heller v. Doe, 509 U.S. 312, 319 (1993). Moreover, "the Equal Protection

---

[4] The Equal Protection Clause appears in the 14th Amendment, which applies only to the states. The Supreme Court, however, has found that it is encompassed by the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government. Bolling v. Sharpe, 347 U.S. 497 (1954).

Clause does not demand for purposes of rational-basis review that a . . . governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." Nordlinger v. Hahn, 505 U.S. 1, 15 (1992). Rather, "a classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Heller, 509 U.S. at 320 (citations omitted).

Here, it is plain that the small, groups of individuals in the park and the casual passersby do not pose the same kind of security threat as do large groups, with their potential to obscure observation, provide tempting targets, and require significantly more manpower and resources to monitor. See Harnischfleger at ¶¶ 13-16. Therefore, plaintiffs' equal protection claims are not persuasive.

**D. The Restriction on Demonstrations in Lafayette Park Is Not a Violation of the APA**

Plaintiffs' claim that the permit revocations violate the APA is without foundation. Under 36 C.F.R. § 1.5(a), the closure of a park area is to "based upon a determination that such action is necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities."

Contrary to plaintiffs' arguments, 36 C.F.R. § 1.5(b) requires publication in the Federal Register, except in emergency situations, of a public use limitation or closure

only if it "is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affects the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature...." Id.

The regulation further provides that "[e]xcept in emergency situations, prior to implementing .... the superintendent shall prepare a written determination justifying the action." Id.

In that regard, the White House sidewalk, Lafayette Park and the Ellipse have been regularly subject to partial and temporary closures and public use limitations for security and public safety reasons. These closures and public use limitations have also occurred by the National Park Service under 36 C.F.R. § 1.5 at the request of the United States Secret Service. Closures have also occurred by the United States Secret Service under their own statutory authorities. <u>See</u> extensive lists in Merryman Decl. at ¶¶ 24-33.

These "closures" and the less restrictive "public use limitations" of these Federal parks under 36 C.F.R. § 1.5, do not constitute an impairment to park resources and values, are not of a nature, magnitude and duration that will result in a significant alteration in the public use pattern, and that less restrictive measures will not suffice. See Merryman at ¶¶ 15-17, 21. Further, they do not adversely affect the parks natural, aesthetic or cultural values and are not of a highly controversial nature. <u>Id.</u>, at 21. Indeed, these closures and public use limitations have neither been the subject of any

complaints to the National Park Service by the public or demonstrators nor subject to criticism in the media. Id. As such, under 36 C.F.R. § 1.5, such closures and public use limitations do not require publication as rulemaking in the Federal Register. It is also consistent with past judicial adjudications, where one demonstrator unsuccessfully challenged various closures four times over the past twelve years, in Picciotto v. United States, No. 99-2113 (D.D.C.), Picciotto v. United States, No. 94-1935 (D.D.C.), Picciotto v. Lujan, No. 90-1261 (D.D.C.), and Picciotto v. Hodel, No. 87-3290 (D.D.C.). All are attached hereto as Exhibit D.

**Irreparable Harm**

While plaintiffs are correct that the denial of a constitutional right is an irreparable harm, they are misunderstanding the situation in this instance. Plaintiffs' constitutional rights are not infringed by the requirement that they exercise those rights in a slightly different but exceedingly similar location. See discussion, infra.

**Public Interest**

The public interest in this matter clearly favors the limited security measures adopted for protection of the President, the White House personnel and all others, including other members of the public. The protection of the President is recognized as a "paramount interest" by this Circuit. White House Vigil, 746 F.2d at 1533, citing A Quaker Action Group v. Hickel, 421 F.2d 1111, 1117 (D.C. Cir. 1969). Moreover, the protection of the others in the vicinity of the White House, whether there for business or

otherwise, is also an important governmental objective. Accordingly, the balance of the equities clearly favors the Secret Service and the Park Service in this case.

**Conclusion**

Therefore, because the actions by the National Park Service and the Secret Service do not impinge on the First Amendment or equal protection rights of the plaintiffs, and do not violate the Religious Freedom Restoration Act nor the Administrative Procedures Act, the plaintiffs have failed to demonstrate a substantial likelihood of success on the merits. Nor do they establish that they would be subject to irreparable harm or that an injunction is in the public's interest. Therefore, their motion for a temporary restraining order must be denied.

Respectfully submitted,

______________________________
ROSCOE C. HOWARD, JR. D.C. Bar #246470
United States Attorney

______________________________
MARK E. NAGLE, D.C. Bar #416364
Chief, Civil Division

______________________________
LAURIE WEINSTEIN, D.C. Bar # 389511
Assistant United States Attorney
Judiciary Center Building, Room 10-112
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7133

Attorney for Defendants