UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK MAHONEY, )
and )
CHRISTIAN DEFENSE COALITION, )
Plaintiffs, )
v. )
HON. GALE NORTON, in her official capacity as SECRETARY OF THE DEPARTMENT OF THE INTERIOR, )
and )
NATIONAL PARK SERVICE )
Defendants. )

DECLARATION OF ERIC G. HARNISCHFEGER,
DEPUTY ASSISTANT DIRECTOR,
OFFICE OF PROTECTIVE OPERATIONS,
UNITED STATES SECRET SERVICE

ERIC G. HARNISCHFEGER declares and states as follows:

1. I am the Deputy Assistant Director, Office of Protective Operations, of the United States Secret Service (Secret Service). I have held this position since January, 2002, and have been a special agent with the Secret Service since January, 1983.

2. In my capacity as Deputy Assistant Director for the Office of Protective Operations, I am charged with the supervision of Secret Service protective details and the Secret Service Uniformed Division. As an agent, I have previously been assigned to the Presidential Protective Division.

3. I am knowledgeable of the Secret Service's policies and practices regarding security measures at the White House complex.

General Information Regarding White House Security

4. Pursuant to Title 18, United States Code, Section 3056, the

Exhibit C 02-1715 (GK)

Secret Service is charged with protecting the President, Vice President, the President-elect and the Vice President-elect, as well as the immediate families of those individuals.

5. Pursuant to Title 3, United States Code, Section 202, the Secret Service Uniformed Division assists the Director of the Secret Service in protecting the President, the Vice President, members of the immediate families of the President and the Vice President, the White House, any building in which Presidential offices are located, the Treasury Building and grounds, and other designated locations and individuals.

6. The Secret Service both designs and implements the security plan for the President, the Vice President, their families and other protectees, as well as for White House complex. In order to develop the most effective security plans possible, the Secret Service continuously looks to enhance its security measures and takes into account past occurrences as well as current conditions. In evaluating the White House security plan, the Secret Service considers many potential threats, including but not limited to terrorist attacks, lone gunmen, fire safety, environmental hazards, chem/bio attack, medical concerns, and structural safety issues.

Security Measures in Response to September 11, 2001 Attacks

7. In the aftermath of the terrorist attacks on the World Trade Center and the Pentagon, the Secret Service expanded the White House security perimeter by closing 15th and 17th Streets, N.W. near the White House complex, closing Lafayette Park, the White House sidewalk and the Ellipse to the public, and cancelling all public tours of the White House.

8. Subsequent to September 11, 2001, several new security measures have been implemented in and around the White House. These enhancements have included imposing truck restrictions on 17th Street. This change was implemented in an attempt to minimize the risk posed to the White House complex, its occupants and the members of the public who visit the White House from the possibility of an attack on the western side of the complex.

9. After September 11, 2001, public tours of the White House tours were eliminated. Currently, only school groups sponsored by a member of Congress or special invitees may tour the building. The names of the invitees and the chaperones accompanying the school groups are screened in advance by the Secret Service, and each visitor is

individually screened for potential hazards. Public tours were eliminated because of the threat posed by unknown individuals inside the White House as well as the threat inherent in the long line of people who typically waited for tickets to the public tours. This line of people, which often lasted for hours, could have proven an attractive target for terrorist activity and, in my opinion, constituted a threat to public safety.

Requests Regarding Group Activity Permits

10. The Secret Service has also requested the National Park Service and the Metropolitan Police Department to temporarily deny permits for special events, demonstrations, parades or marches in areas adjacent to the White House complex since September 11. These requests have been issued on a monthly basis in order to allow us to effectively assess the current threat level as it appears at that time and to respond appropriately, bearing in mind the public interest in accessing these areas. Should we conclude at any point that security concerns have lessened such that large groups can safely utilize these spaces, we will notify the National Park Service immediately. The decision to make a request or rescind a request regarding permitted activity is made each month by the Office of Protective Operations, the division within the Secret Service with oversight authority over all the protective details, including the Presidential Protective Division, the Major Events Division, and the Uniformed Division.

11. On September 24, 2001, the Office of Protective Operations sent the first of a series of letters to the National Park Service asking the National Park Service not to issue demonstration or special event permits for Lafayette Park, the Ellipse, and the area known as the White House Sidewalk for a period of 30 days.

12. The Secret Service has also asked the Metropolitan Police Department to deny march or parade permits for Pennsylvania Avenue between 15th St., N.W. and 17th St., N.W.; E St. between 15th St., N.W. and 17th St., N.W.; State Place; Madison Place between Pennsylvania Avenue and H St., N.W.; Jackson Place between Pennsylvania Avenue and H St., N.W.; and Alexander Hamilton Place for thirty-day periods after September 11. As with the areas controlled by the National Park Service, these locations are adjacent to the White House complex and require additional security precautions in the current climate. These requests of the Metropolitan Police Department have been made on a monthly basis, after weighing the security risks with the public's interest in utilizing these spaces for speech and special event activity.

13. The requests of the National Park Service and the Metropolitan Police Department have been based on intelligence sources and investigative reports that have indicated that the White House complex may be a target for continued terrorist activity. Based on the current available intelligence and investigative information, it is our position that groups in areas so near the White House will be difficult for law enforcement officials to evacuate, that the presence of a large group could unintentionally provide cover activity such that a terrorist could approach the complex without attracting attention, and that large groups in close proximity to the White House could themselves present inviting targets for terrorist activity.

14. The Secret Service considers it both impractical and ineffective to add more personnel to monitor group activity. The presence of additional law enforcement officers would not negate the target value of a large crowd, which would only be made larger with additional officers. Additionally, there is no guarantee that an increased number of officers would be able to detect and stop an attack or to detect and stop terrorists surveilling the White House for a future attack. Incidents in other countries have demonstrated the inherent difficulties in detecting an attacker who is using a crowd for cover. For example, the December, 1999, suicide bombing attack on the Sri Lankan president during a rally illustrates the difficulty of locating a suicide bomber in a crowd of people. Photographs of two attacks in Sri Lanka can be provided to the court as a sealed exhibit.

15. It is absolutely critical that the Secret Service be able to quickly and efficiently evacuate the White House complex, particularly given the current heightened state of alert declared by the Office of Homeland Security. The presence of large groups in and around the White House could well hinder the effective evacuation of the buildings within the complex. Additionally, a threat to the White House could, for public safety reasons, require the immediate evacuation of the public from Lafayette Park and the White House sidewalk area. The presence of large groups could make this more difficult and require manpower that could well be needed elsewhere.

16. Since the initial request in September, 2001, the Secret Service has continuously monitored the threat level to the White House, and, bearing in mind the significant public interest in accessing these areas for speech and special event activity, has made adjustments accordingly. In December, 2001, the Secret Service did not request that permits be denied for the Ellipse and has not made a request since. In evaluating the risks posed by groups in the

Ellipse, we have repeatedly considered the fact that the Ellipse is farther away from the White House than is Lafayette Park. This greater distance affords more protection for the White House from possible attack from the Ellipse as well as more protection for the public should the White House be attacked. Accordingly, the Ellipse is now available for special event and demonstration activity.

17. In support of our decision to request the National Park Service to deny or revoke special event and demonstration permits for August and September, 2002, we have material that has been properly classified pursuant to Executive Order No. 12968 to be submitted for the court's review. This classified material sets forth some of the pertinent intelligence information we have received regarding threats to the President and the White House complex.

Conclusion

18. The Secret Service requests of the National Park Service and the Metropolitan Police Department regarding permitting for large groups in and around the White House complex have been designed to reduce the potential for an attack that could injure the President, Vice President, their families, or a member of the public. After careful consideration of the available alternatives, we believe that these temporary requests will allow the public to express their views or hold special events in areas near the White House without compromising security.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

8/28/02
Date

Eric G. Harnischfeger
Deputy Assistant Director,
Office of Protective Operations,
United States Secret Service