UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONCEPTION PICCIOTTO, et al., Plaintiffs,

v.

UNITED STATES OF AMERICA, et al., Defendants.

CA NO. 99-2113

Washington, D.C.
August 6, 1999
5:40 p.m.

TRANSCRIPT OF TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE HENRY H. KENNEDY, JR.,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: MR. WILLIAM THOMAS, Pro se

For the Defendant: ERIC JAFFE, ESQ.
RANDOLPH MYERS, ESQ.

Court Reporter: EDWARD N. HAWKINS, RMR
Official Court Reporter
Room 6806, U.S. Courthouse
Washington, D.C. 20001
(202) 273-0881

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription

web site of the person who holds the permit for the Knight's of --

THE COURT: Freedom?

MR. THOMAS: Freedom.

THE COURT: The court will take the matter under advisement for 20 minutes, perhaps longer, but perhaps no more than 20 minutes, and I will come back and render my decision.

**(Recess from 6:15 p.m. until 7:05 p.m.)**

THE COURT: All right. The court has taken under advisement its decision, which of course is the motion, is a decision that will be a resolution of the plaintiff's motion for a temporary restraining order -- application for a temporary restraining order.

By this application plaintiffs seek a court order that would prohibit the National Park Service from forcing them to relocate their 24-hour-a-day 365-day-a-year vigil for the global elimination of nuclear weapons, one that has persisted since 1981, the court is told from an area located in Lafayette Park which the Park Service indicates that it needs and intends to use as a buffer zone between competing demonstrations in the Park: one on the left side of the park and the other on the -- well, east and west side of the park. Plaintiffs say that to permit this relocation will trammel upon their First Amendment rights.

The court has considered the plaintiffs' arguments,

the ones made in their papers which expands upon what I have just said, as well as the statements of Mr. Thomas at this hearing as well as the arguments made in opposition to the application by representatives of the Government.

Having considered these arguments the court concludes that the application should be denied.

It is, of course, black letter law that in a legal proceeding seeking injunctive relief the party seeking such relief carries a very heavy burden, one of showing, among other things, that he or she is likely to prevail on the merits;

That he or she will suffer irreparable injury should the temporary restraining order or the injunctive relief not be granted;

And that the issuance of the injunctive order would not disserve the public interests.

The court is of the view that plaintiffs have not demonstrated, one, that they will suffer irreparable injury and, two, that issuance of this order would not disserve the public interests.

The bottom line is that the plaintiffs may maintain their vigil within 30 feet of where it is located at this very moment at all times.

Requiring plaintiff to move such a short distance for such a temporally-limited period of time, while implicating First Amendment concerns, in my view, this does so only barely.

the circumstances, which is not to criticize him for making the points which he's made, but I believe that the court should give some deference to the police authorities.

The court has also considered the plaintiff's position that this action by the Park Service is in violation of 36 CFR Section 1.5.

I believe that the section of that section that is applicable is found in subsection(b), which states that -- and I just quote here -- that, except in emergency situations, a closure designation, use, or activity, restriction, or condition, or the termination or relaxed section of such which is of a nature, magnitude, and duration that will result in a significant alteration in the public use pattern of the Park area, adversely affect the Park's natural esthetic, scenic or cultural values require a long-term or significant modification in the resource management objectives of the unit or is of a highly controversial nature shall be published as rule making in the Federal Register.

And the court is of the view that this situation is simply not covered by this section that would require this activity of the partial closing to be first published in the Federal Register.

For these reasons, the application for a temporary restraining order is denied.

Good day.

(Proceedings concluded at 7:16 p.m.)

---

CERTIFICATE

I, EDWARD N. HAWKINS, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

Edward N. Hawkins

Edward N. Hawkins, RMR

fe90908enh

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONCEPCION PICCIOTO, *et al.*, Plaintiffs, | ) | |
| v. | ) | C.A. No. 99-2113 (TPJ) |
| THE UNITED STATES OF AMERICA, *et al.*, Defendants. | ) | |

FILED
SEP 30 1999
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

**ORDER**

Upon consideration of defendants' motion to dismiss, plaintiffs' response thereto, the entire record herein, and the proceedings in open court on September 30, 1999, it appearing to the Court that plaintiffs fail to make a showing that there is a live controversy before this Court, it is, this 30th day of September, 1999,

ORDERED that this case is dismissed as moot.

Thomas Penfield Jackson
U.S. District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCEPCION PICCIOTTO, et al., Plaintiffs, v. THE UNITED STATES OF AMERICA, et al., Defendants. | Civil No. 94-1935 (CRR) |

FILED
SEP 09 1994
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

MEMORANDUM OPINION OF CHARLES R. RICHEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

Ellen Thomas and William Thomas, pro se, for the Plaintiffs.

Eric H. Holder, United States Attorney, and Sally Rider, Assistant United States Attorney, for the Government.

On September 7, 1994, the Court received a Complaint for Declaratory and Injunctive Relief and an Application for an Expedited Temporary Restraining Order ("TRO") and Petition for Preliminary Injunction filed in Forma Pauperis by Plaintiffs Concepcion Picciotto, Ellen Thomas, and William Thomas. The Plaintiffs named as Defendants the United States of America, the United States Park Service, the United States Park Police, and the United States Secret Service. The Court held a hearing on that date which was continued until September 8, 1994, in light of the parties' representations that the matter might become moot by the evening of September 7, 1994.

On September 8, 1994, the Court held a further hearing on the Plaintiffs' Complaint and Application for an Expedited TRO. The Complaint and TRO seek, in pertinent part, to enjoin the Defendants from closing any portion of Lafayette Park without complying with the provisions of 36 C.F.R. § 1.5, and from closing the southern sections of Lafayette Park to demonstrators and the general public. The Plaintiffs allege that on or about September 6, 1994, a U.S. Park Ranger hand-delivered a document entitled "Notice to the Public" to Ms. Thomas which advised her and others using the Park for demonstration purposes that the Park would be closed from Wednesday, September 7, at approximately 5 a.m. through Monday, September 12, at 3 p.m. See Exhibit A which is attached hereto and made a part hereof. With this notice was a map of Lafayette Park showing a closure area which included all of the Park except for a large area in the northeast quadrant of the Park, and a small portion along Pennsylvania Avenue in the southeast quadrant of the Park, directly across from the White House. See Exhibit B which is attached hereto and made a part hereof. The notice further provided that persons demonstrating or otherwise using the Park should remove themselves and any personal property from these areas. The stated reason for this measure was to provide necessary security to the President of the United States.

Upon consideration of the Plaintiffs' Complaint and Application for a TRO, the Court determined that the Plaintiffs' First Amendment right to free speech was implicated because of the abrupt nature of the notice described above. The Court thus

decided to conduct a hearing not only upon the Plaintiffs' application for a TRO, but to combine their request for a preliminary injunction with a hearing on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. This Memorandum Opinion and Order of even date shall constitute the Court's findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

At the hearing on September 8, 1994, Thomas F. Farrell, a Special Agent of the United States Secret Service Agency who is in charge of the White House Division, testified, among other things, that the limited closure of the Park was necessitated by concerns for the security and safety of the President and his family who had temporarily moved to the Blair House, the government-owned guest quarters across Pennsylvania Avenue, while work involving the removal of asbestos was being completed on the White House.

The Court noted that the question presented before it was whether the limited closure of Lafayette Park was a reasonable time, place and manner restriction on the conduct of those demonstrating in the Park, and others, in light of the particular security concerns posed by the First Family's temporary lodging at the Blair House. Upon consideration of the papers before the Court, the applicable law, the testimony of the witnesses, the exhibits received in evidence, and the parties' oral arguments, the Court finds that the restriction was reasonable and, accordingly, denies the Plaintiffs' Application for an Expedited TRO. Moreover, the Court finds that denial of the TRO is proper because there is

no possibility that the Plaintiff can prevail on the merits. See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841 (D.C. Cir. 1977). It was undisputed that the President and his family had to move to the Blair House, and that the security of the First Family is of paramount importance. Under these particular circumstances, additional security measures were required to ensure the First Family's safe access from the Blair House to the White House, and to protect against any threats on the President's life, particularly in light of the assassination attempt which occurred during late President Harry Truman's stay at the Blair House from 1948-1952. The Court finds that the closure of a limited portion of the Park, for a limited period of time, was a reasonable exercise of the discretionary powers of those charged with protecting the President and his family and do not warrant a Temporary Restraining Order under these particular circumstances. The Court further finds that the Defendants' actions were consistent with the Plaintiffs' First Amendment rights and with the requirements of 36 C.F.R. § 1.5.[1]

Upon consideration of the testimony of Mr. Farrell regarding the temporary nature of the Park's closure, the Court has

---

[1] This provision states that "[e]xcept in emergency situations, a closure, designation, use or activity restriction . . . which is of a nature, magnitude and duration that will result in a significant alternation in the public use pattern of the park[] . . . shall be published as rulemaking in the Federal Register." 36 C.F.R. § 1.5(a) (1993) (emphasis added). The Court finds that the Defendants' actions did not violate this provision because the closure of a limited area of the Park was temporary, because it did not significantly alter the public use pattern of the Park, and because it was done under an emergency situation.

determined that the case shall be dismissed, and in any event will be moot by its terms on Monday, September 12, 1994, when the Park is scheduled to return to its normal operation. The Court shall thus issue an Order of even date herewith consistent with the foregoing Memorandum Opinion.

September 9, 1994

CHARLES R. RICHEY
UNITED STATES DISTRICT JUDGE

EXHIBIT A

United States Department of the Interior

NATIONAL PARK SERVICE

NATIONAL CAPITAL REGION
1100 OHIO DRIVE S.W.
WASHINGTON, D.C. 20242

SEP -6 1994

FILED
SEP 09 1994
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

# NOTICE TO THE PUBLIC

All but the northeast portion of Lafayette Park will be closed to the public and demonstrators use from Wednesday, September 7, at approximately 5 a.m. through Monday, September 12, at 3 p.m. A map illustrating the closed areas is identified on the reverse of this notice.

Persons demonstrating or otherwise using these park areas should remove themselves and any personal property from these areas.

These actions are necessary to provide security to the President.

Stan E Lock

Deputy Associate Regional Director
National Park Service
National Capital Region
White House Liaison

EXHIBIT B




FILED
SEP 09 1994
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Date: 9-5-94
National Park Service
National Capital Region
White House Liaison

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCEPCION PICCIOTTO, et al., Plaintiffs, v. THE UNITED STATES OF AMERICA, et al., Defendants. | Civil No. 94-1935 (CRR) |

FILED
SEP 09 1994
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

**ORDER**

Upon consideration of the Plaintiffs' Complaint for Declaratory and Injunctive Relief and an Application for an Expedited Temporary Restraining Order ("TRO") and Petition for Preliminary Injunction, the applicable law, the oral arguments of counsel, the entire record herein, and for all of the reasons articulated in this Court's Memorandum Opinion issued of even date herewith, the Court has determined that the Plaintiffs' application for a TRO shall be denied, and their Complaint shall be dismissed as [redacted] it shall be moot by its terms as of September 12, 1994.

Accordingly, it is, by the Court, this 9th day of September, 1994,

ORDERED that the Plaintiffs' Application for an Expedited Temporary Restraining Order and Petition for Preliminary Injunction shall be, and hereby is, DENIED; and it is

FURTHER ORDERED that the Plaintiffs' Complaint for Declaratory and Injunctive Relief shall be, and hereby is, DISMISSED from the

dockets of this Court, as it shall be, and hereby is, declared MOOT as of September 12, 1994, thereby necessitating no further action by the Court in view of the prayers for relief as set forth in the Complaint in this case.

CHARLES R. RICHEY
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
JUL 18 1990
CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCEPCION PICCIOTTO, et al. Plaintiffs, v. MANUEL LUJAN, et al. Defendants. | Civil Action No. 90-1261 |

JUL 24

ORDER

Presently pending before the Court is plaintiffs' motion for reconsideration of this Court's June 18, 1990 Order dismissing the instant action as moot. Plaintiffs repeat earlier arguments which have already been considered and rejected by the Court. They do raise a new issue, however, i.e., that a suit which is brought as a class action is a factor which may affect the mootness determination. However, plaintiffs have never requested, nor have they been granted, class certification.[1]

Plaintiffs' motion for reconsideration is denied.

IT IS SO ORDERED.
July 18, 1990

Joyce Hens Green
JOYCE HENS GREEN
United States District Judge

[1] Although the caption of plaintiffs' complaint does state "Class Action," plaintiffs have never complied with the appropriate rules for obtaining class certification nor has the Court ever certified a class.

(N)

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCEPCION PICCIOTTO, ET AL., PLAINTIFFS PRO SE | DOCKET NO. CA 90-1261 |
| VS. | WASHINGTON, D. C. MAY 30, 1990 4:15 P.M. |
| MANUEL LUJAN, ET AL., DEFENDANTS | |

TRANSCRIPT OF HEARING ON
MOTION FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE JOYCE HENS GREEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS: WILLIAM THOMAS

FOR THE DEFENDANTS: JOHN CLEARY, AUSA
MICHAEL MARTINEZ, AUSA
U. S. ATTORNEY'S OFFICE
555 4TH STREET, N.W.
WASHINGTON, D. C. 20001

OFFICIAL COURT REPORTER: GORDON A. SLODYSKO
4806-A U.S. COURTHOUSE
WASHINGTON, D. C. 20001
(202) 535-3404

COMPUTER-AIDED TRANSCRIPTION OF STENOGRAPHIC NOTES

P R O C E E D I N G S

THE COURT: GOOD AFTERNOON.

THE DEPUTY CLERK: CIVIL ACTION 90-1261, CONCEPCION PICCIOTTO, ET AL., VERSUS MANUEL LUJAN, ET AL. MR. THOMAS FOR THE PLAINTIFFS; MR. CLEARY AND MR. MARTINEZ FOR THE DEFENDANTS.

THE COURT: MR. THOMAS, I SEE YOU SITTING AT COUNSEL TABLE. AND WOULD YOU PLEASE INTRODUCE ME TO THE OTHER INDIVIDUAL AT THE TABLE?

MR. THOMAS: THIS IS SONG, YOUR HONOR, ONE OF THE OTHER PLAINTIFFS.

THE COURT: ALL RIGHT. AND MR. SONG IS ALSO KNOWN AS BRETT HAMRICK? IS THAT CORRECT?

MR. THOMAS: THAT'S CORRECT.

THE COURT: YES. I'M READING FROM YOUR CAPTION.

I UNDERSTAND THAT YOU FILED THIS ACTION ON -- WELL, IT SAYS MAY 29. WE HEARD ABOUT IT TODAY. AND THAT YOU HAVE REQUESTED A TEMPORARY RESTRAINING ORDER, AS A RESULT OF WHICH WE SET IT DOWN FOR 4:00 O'CLOCK THIS AFTERNOON AND INVITED THE UNITED STATES ATTORNEY'S OFFICE TO ATTEND. AND I NOTE THAT THEY ARE HERE AT COUNSEL TABLE.

WOULD YOU LIKE TO INTRODUCE WHOEVER IS GOING TO BE THE SPOKESPERSON FOR THE UNITED STATES ATTORNEY'S OFFICE?

MR. CLEARY: I WILL, YOUR HONOR. MY NAME IS JOHN CLEARY. I'M FROM THE U. S. ATTORNEY'S OFFICE. WITH ME IS MR. MICHAEL MARTINEZ. KIRK ROBBINS IS FROM DEPARTMENT OF INTERIOR,

TOM DOUGHERTY FROM THE UNITED STATES SECRET SERVICE, AND MR. RANDY MYERS FROM THE DEPARTMENT OF INTERIOR AS WELL.

THE COURT: ALL RIGHT.

MR. CLEARY: AND WE ALSO, YOUR HONOR, HAVE TWO WITNESSES HERE FROM THE SECRET SERVICE AND THE U. S. PARK POLICE THAT ARE READY TO TESTIFY SHOULD YOUR HONOR SO DESIRE.

THE COURT: GOOD.

ALL RIGHT. WE HAVE, IN ESSENCE, A REQUEST THAT THERE BE A TEMPORARY RESTRAINING ORDER ISSUED TO RESTRAIN THE DEFENDANTS, WHO ARE LISTED AS THE SECRETARY OF THE DEPARTMENT OF INTERIOR, MR. MCDANIEL OF THE UNITED STATES PARK SERVICE, UNITED STATES PARK POLICE, AND UNITED STATES SECRET SERVICE, AND THE REQUEST IS TO ENTER A TEMPORARY RESTRAINING ORDER TO RESTRAIN THOSE DEFENDANTS FROM CLOSING THE SOUTHERN SECTIONS OF LAFAYETTE PARK OR FROM PARKING ANY VEHICLES IN THE, QUOTE, NO PARKING/NO STANDING, END QUOTE, ZONE ON THE NORTH SIDE OF PENNSYLVANIA AVENUE BETWEEN JACKSON AND MADISON PLACES, ADJOINING THE SOUTH SIDEWALK OF LAFAYETTE PARK, IN WASHINGTON, D. C. DURING THE PERIOD FROM MAY 31 TO JUNE 3, 1990. AND AS I UNDERSTAND THE PAPERS -- AND, OF COURSE, WE'LL LET YOU SPEAK TO THAT BRIEFLY, MR. THOMAS -- THIS COMES ABOUT AS A RESULT OF A NOTICE TO THE PUBLIC THAT IS DATED MAY 17, 1990, AND SIGNED BY JAMES MCDANIEL, ASSOCIATE REGIONAL DIRECTOR, NATIONAL CAPITAL REGION, NATIONAL PARK SERVICE, THAT INDICATED THAT THE SOUTHERN PORTION OF LAFAYETTE PARK WILL BE CLOSED TO THE PUBLIC AND DEMONSTRATORS'

I THINK THAT UNLESS THE GOVERNMENT CAN SHOW THAT -- WE ALSO RAISE THE INFERENCE THAT THE PURPOSE FOR THE ACTION MAY BE IMPERMISSIBLE. AND WE THINK THAT UNLESS THE GOVERNMENT CAN SHOW THAT THEY HAVE SOME VALID SECURITY CONCERN THAT PERMITS THEM TO ABRIDGE NORMAL CONSTITUTIONAL PROTECTIONS, THEN WE SHOULD PREVAIL.

THANK YOU.

THE COURT: ALL RIGHT. MR. CLEARY.

MR. CLEARY: YOUR HONOR, BEFORE I BEGIN, I WOULD LIKE TO JUST REITERATE THAT THE GOVERNMENT IS PREPARED TO MAKE THE SAME REPRESENTATION THIS YEAR THAT WE MADE IN 1987 IN CONNECTION WITH THE PRIOR CASE BEFORE JUDGE OBERDORFER: THAT DURING THE PERIOD THAT DEMONSTRATORS AND MEMBERS OF THE PUBLIC ARE NOT IN THE AREA, THE SOUTHERN AREA OF THE PARK, THE PARK SERVICE WILL INSTRUCT THE OFFICERS TO USE BEST EFFORTS TO PROTECT ANY SIGNS BELONGING TO THE PLAINTIFFS HERE. THIS IS OBVIOUSLY NOT A GUARANTEE THAT THOSE SIGNS WILL BE ATTACKED OR SECURED. BUT IT WILL, AS I SAY, CONSTITUTE A REPRESENTATION THAT BEST EFFORTS WILL BE UNDERTAKEN TO PROTECT THOSE SIGNS.

THE CASE IS BASICALLY SUBJECT TO A FOUR-PART TEST AS ANY OTHER T.R.O. APPLICATION WOULD BE, AND I WOULD LIKE TO JUST GO THROUGH THE FOUR PARTS POINT BY POINT AND REBUT THE SHOWING MADE BY THE PLAINTIFFS.

THE FIRST PART OF THE TEST IS THE LIKELIHOOD OF SUCCESS ON THE MERITS. CASE LAW IS VERY CLEAR THAT THAT LIKELIHOOD

SHOULD BE A STRONG OR SUBSTANTIAL LIKELIHOOD OF SUCCESS. THE FIRST AMENDMENT CLAIM, THE PLAINTIFFS IN HIS SUPPLEMENTAL SUBMISSION THAT CAME IN SEVERAL -- JUST OVER AN HOUR AGO TO OUR OFFICE, HE ADMITS AT PAGE 2 OF HIS SUPPLEMENTAL MEMORANDUM THAT -- HE ADMITS THAT HE HAS NO HARD EVIDENCE TO SUPPORT HIS CLAIM OF SUPPRESSION OF COMMUNICATIVE ACTIVITIES, AND I THINK HE'S ALREADY REITERATED THIS AFTERNOON THAT HE -- THAT THERE MA BE AN IMPERMISSIBLE PURPOSE HERE.

THE PAPERS MAKE CLEAR, YOUR HONOR, THAT THERE IS NO FIRST AMENDMENT INFRINGEMENT HERE AT ALL. ALL THAT IS AT ISSUE IS MOVING PEOPLE ON A TEMPORARY BASIS -- ALL PEOPLE, MEMBERS OF THE PUBLIC AS WELL AS DEMONSTRATORS, AND DEMONSTRATORS OTHER THAN THE PLAINTIFFS, BACK A DISTANCE OF WHAT I UNDERSTAND TO BE 50 TO 75 YARDS BACK INTO THE PARK DURING MOTORCADES OF PRESIDEN GORBACHEV.

THE COURT: WOULD YOU EXPLAIN TO ME WHAT THAT MEANS, 5 TO 75 YARDS BACK INTO THE PARK?

MR. CLEARY: BACK FROM THE SIDEWALK ON THE NORTH SIDE OF PENNSYLVANIA AVENUE, YOUR HONOR.

THE COURT: SO THAT'S 50 TO 75 YARDS FROM THE SIDEWALK INTO THE PARK.

MR. CLEARY: THAT'S CORRECT. AND THE -- OH! I'M CORRECTED THAT IT'S 50 TO 75 FEET.

THE MAP THAT THE PLAINTIFF HAS SUBMITTED, AS I UNDERSTAND, IS ACCURATE, THAT THAT'S THE PARK SERVICE MAP AND

THAT DEPICTS THE BASIC AREAS THAT ARE SHADED THAT ARE NOT GOING TO HAVE ANY PEOPLE IN THEM DURING THE MOTORCADES.

THE COURT: THESE ARE ESSENTIALLY -- EXCUSE ME, SIR -- THE AREAS THAT VIEW THE WHITE HOUSE, THAT ARE ACROSS THE STREET FROM THE WHITE HOUSE; IS THAT RIGHT?

MR. CLEARY: THAT'S CORRECT, YOUR HONOR. SPECIFICALLY, ACROSS FROM THE ENTRANCE GATES. I CAN HAND UP A SECOND COPY OF THE NOTICE.

THE COURT: I HAVE A COPY OF THE NOTICE WITHIN THE PAPERS. IN FACT, I HAVE IT RIGHT HERE. THANK YOU.

MR. CLEARY: OKAY.

THE COURT: AND A MAP UNDERNEATH IT.

MR. CLEARY: THE MAP, YOUR HONOR. AND AS YOUR HONOR WILL NOTE, THERE'S A CIRCULAR SHAPE TO THIS THAT BASICALLY IS FOCUSED IN ON THE ENTRANCES TO THE WHITE HOUSE GROUNDS WHERE A MOTORCADE WOULD GO IN AND COME OUT. THAT'S THE THINKING BEHIND THE SHAPE OF THE SHADED AREA.

AND THE PROCEDURE, AS I UNDERSTAND IT, IS FOR A BRIEF PERIOD BEFORE A MOTORCADE IN AND BEFORE A MOTORCADE OUT, AND A BRIEF PERIOD BEING HERE 30 TO 60 MINUTES, THE PARK POLICE OFFICERS ON THE SCENE WILL MOVE ALL PERSONNEL OUT OF THE SHADED AREAS AND BACK TO THE DOTTED LINE, WHICH, AS YOUR HONOR CAN SEE IS STILL WITHIN SIGHT DISTANCE OF PENNSYLVANIA AVENUE. AND THE SIGNS THAT ANY DEMONSTRATORS WILL HAVE -- THAT THE PLAINTIFFS HAVE WILL BE LEFT BEHIND, WILL BE LEFT IN THEIR POSITIONS, AND

ALL PEOPLE WILL BE DIRECTED BACK BEHIND THE DOTTED LINES HERE. SO THAT FOR FIRST AMENDMENT PURPOSES, ANY MESSAGE BEING COMMUNICATED BY THE SIGNS WILL CONTINUE TO BE COMMUNICATED, AND THE DEMONSTRATION ITSELF WILL BE MOVED A 50- TO 75-FOOT DISTANCE BACK INTO THE PARK OR, AS YOUR HONOR HAS NOTED, NORTHWARD FROM PENNSYLVANIA AVENUE, THUS LEAVING THAT MESSAGE ALSO UNTRAMMELED AND WITH ABUNDANT ALTERNATIVE CHANNELS OF COMMUNICATION OF THAT MESSAGE, AS REQUIRED BY THE CASE LAW.

I ALSO SHOULD EMPHASIZE THAT THE MOVEMENT OF THESE PEOPLE IS OF TEMPORARY DURATION; IT IS ONLY DURING MOTORCADES IN AND OUT. IT IS NOT DURING THE DURATION OF PRESIDENT GORBACHEV'S PRESENCE ON THE WHITE HOUSE GROUNDS. IT'S ONLY FOR THE MOTORCADES. AND IT'S ONLY FOR MOTORCADES THAT GO IN AND OUT OF THOSE TWO NORTH GATES, AND NOT THE SOUTHWEST GATE OR ANY OTHER GATES TO THE WHITE HOUSE GROUNDS.

THE COURT: THE TWO NORTH GATES. ALL RIGHT.

MR. CLEARY: THAT'S CORRECT.

I ALSO SHOULD EMPHASIZE, IT'S ALSO FOR MRS. GORBACHEV, AS WELL. EITHER OF THOSE TYPES OF MOTORCADES IS WHAT WE'RE TALKING ABOUT.

AND ON BALANCE, YOUR HONOR, THIS HAS BEEN DESIGNED AS A LEAST RESTRICTIVE METHOD OF ACCOMMODATING THE SERIOUS AND IMPORTANT SECURITY CONCERNS FOR A VISITING HEAD OF STATE AND ACCOMMODATING THAT WITH THE EXPRESSIVE AND COMMUNICATIVE ACTIVITIES OF PERSONS PRESENT IN THE PARK.

3

THE SECOND PART OF THE TEST IS WHAT THE HARM, IF ANY, WILL BE TO THE PLAINTIFF FROM DENIAL OF THE T.R.O. WE SUBMIT THAT THAT HARM HERE IS NEGLIGIBLE. AS I SAID, THE SIGNS STAY, AND THE DEMONSTRATION ITSELF WOULD STILL BE THERE, BUT WILL BE MOVED BACK THIS MINOR DISTANCE OF 50 TO 75 FEET BACK INTO THE PARK.

THE THIRD BRANCH IS THE HARM TO THE GOVERNMENT FROM GRANTING OF THE T.R.O. WE SUBMIT HERE THAT COMPROMISING THE LEVEL OF SECURITY -- THE SECURITY PROTECTIONS HERE HAVE BEEN FORMED BY EXPERTS AND ARE THE RESULT OF SECURITY JUDGMENTS BY LAW ENFORCEMENT PERSONNEL AT THE SECRET SERVICE AND AT THE PARK POLICE, IN COORDINATION WITH WHATEVER OTHER NECESSARY LAW ENFORCEMENT INPUT. THEY ARE DESIGNED ON A CASE-BY-CASE BASIS WITH CONSIDERATION OF A NUMBER OF FACTORS: THE IDENTITY OF THE PROTECTEE, THE OTHER SECURITY CONSTRAINTS THAT ARISE IN ANY KIN OF VISIT OF THIS NATURE. IT'S MY UNDERSTANDING THAT STRICTER SECURITY PRECAUTIONS HAVE BEEN USED IN THE PAST AT LAFAYETTE PARK AND MORE LENIENT SECURITY PRECAUTIONS HAVE BEEN USED ON TH OCCASION OF VISITS AND MOTORCADES BY FOREIGN DIGNITARIES. AND THE HARM TO THE GOVERNMENT FROM GRANTING A T.R.O. AND INTERFERING WITH THOSE SECURITY JUDGMENTS IS -- I THINK SPEAKS FOR ITSELF. IT IS COMPROMISING THE LEVEL OF SECURITY PROTECTIO DEEMED APPROPRIATE BY THE SECURITY EXPERTS, FOR, OBVIOUSLY, A VERY IMPORTANT FOREIGN HEAD OF STATE.

FINALLY, THE PUBLIC INTEREST, THE FOURTH BRANCH OF THE

ANALYSIS, IS, WE SUBMIT, IN LETTING THE SUMMIT GO FORWARD WITH THE PLANNED LEVEL OF SECURITY BY EXPERTS. AND THAT'S WHAT I MEAN ABOUT THE TWO WITNESSES THAT ARE AVAILABLE TO TESTIFY; THEY WILL ELABORATE ON THAT POINT. TO LET THAT SUMMIT GO FORWARD AT THAT LEVEL OF SECURITY DEEMED APPROPRIATE BY THE EXPERTS AT THE SECRET SERVICE AND OTHER LAW ENFORCEMENT ACTIVITIES.

FOR THESE REASONS, WE SUBMIT THAT THE T.R.O. SHOULD BE DENIED.

THE COURT: AN ASSOCIATE WISHES TO COMMUNICATE WITH YOU.

MR. CLEARY: OH! YES. AND, YOUR HONOR, I OBVIOUSLY SHOULD EMPHASIZE THAT JUDGE OBERDORFER FACED THE EXACT SAME FACTS, THE EXACT SAME PLAINTIFFS, THE EXACT SAME PARTIES, AND REACHED A DETERMINATION TO DENY THE T.R.O. IN 1987. AND WE HAVE COPIES OF THAT ORDER AND ATTACHED TRANSCRIPT TO SUBMIT TO THE COURT AS WELL.

THE COURT: I HAVE READ IT.

MR. CLEARY: THANK YOU, YOUR HONOR.

MR. THOMAS: COULD I SEE A COPY OF THAT?

MR. CLEARY: I'LL HAND A COPY OF THAT TO THE PLAINTIFF.

THE COURT: CERTAINLY. I SAW IT IN THE OFFICIAL JACKET.

MR. THOMAS: I TRIED TO GET AHOLD OF IT, BUT MY FILING SYSTEM ISN'T WHAT IT SHOULD BE.

THE COURT: MR. CLEARY IS GIVING YOU A COPY OF IT, MR.

THOMAS. THE ORDER WAS SIGNED ON DECEMBER 9, 1987.

NOW, MR. THOMAS, IS THERE ANYTHING THAT YOU WISH TO RESPOND? WE ARE GOING TO TAKE SOME BRIEF TESTIMONY.

MR. THOMAS: I WOULD JUST LIKE TO SAY THAT AS FAR AS THE HARM GOES, IN FACT, IF THE POLICE CARS ARE PARKED ALONG THE NORTH SIDE OF THE SIDEWALK, THE SIGNS WILL BE OBSCURED, AND SO I THINK THAT THAT WILL BE HARMFUL.

I THINK THAT THERE IS A LIKELIHOOD THAT MR. GORBACHEV MIGHT WISH TO ASSOCIATE WITH US, AND THESE PRECAUTIONS WILL PRECLUDE THAT. AND I THINK THAT THE PUBLIC INTEREST -- I CAN'T REALLY RESPOND TO MANY OF THE THINGS THAT WERE SAID UNTIL AFTER THE TESTIMONY, BUT I THINK THERE'S A PUBLIC INTEREST IN INSURING THAT FREEDOMS OF SUCH AN IMPORTANT MAGNITUDE AS SPEECH AND ASSOCIATION ARE CAREFULLY GUARDED AGAINST UNNECESSARY ACTIONS BY GOVERNMENT AGENCIES.

THE COURT: WE STILL HAVE MORE TO DEVELOP IN THIS MATTER, MR. THOMAS, BUT I WOULD SAY THAT MY REMEMBRANCE, AND IT IS ONLY THAT, OF MR. GORBACHEV'S VISIT TO THIS COUNTRY SOME TIME AGO DID INCLUDE HIS PARTICIPATION WITH THE PUBLIC, SOMEWHAT TO THE CONCERN OF THE SECURITY INTERESTS THAT WERE GUARDING HIM. AND ALSO, I HEARD ON THE RADIO, OF WHATEVER ACCURACY IT MIGHT BE, DRIVING IN THIS MORNING THAT MR. GORBACHEV MINGLED IN A CANADIAN MALL WITH THE PUBLIC IN CANADA. SO, IF HE WISHES TO COMMUNICATE, I'M CONFIDENT HE WILL FIND A WAY TO DO SO WITHIN REASONABLE LIMITS. BUT WE'LL GET TO THAT MATTER SUBSEQUENTLY.

LET'S HEAR BRIEFLY FROM --

MR. THOMAS: THERE IS ONE OTHER THING.

THE COURT: ONE OTHER THING? LET ME HEAR FROM YOU.

MR. THOMAS: I THINK, IF MY MEMORY SERVES ME CORRECT -- AND I HAVEN'T HAD A CHANCE TO LOOK AT THIS CLEARLY, AND JUDGE OBERDORFER ONLY ATTACHED A FEW PAGES OF THE TRANSCRIPT HERE. BUT IF MY MEMORY SERVES ME CORRECTLY, IT WAS RATHER CLEAR THAT IN THE LAST HEARING, THE GOVERNMENT HAD NOT -- AND THIS IS ALSO UNDER THE PROCEDURAL CLAIMS THAT I'M MAKING HERE. THE GOVERNMENT AT THAT TIME HAD NOT COMPLIED WITH THE REQUIREMENTS OF THE ADMINISTRATIVE PROCEDURE ACT OR 36 CFR 1.5. AND IF I RECALL, MR. MARTINEZ MADE THE REPRESENTATION THAT THIS WAS GOING TO BE A ONE-SHOT DEAL, I THINK HE SAID. AND SO I THINK WE SHOULD ALSO BE ABLE TO FOCUS HERE ON WHETHER OR NOT THE GOVERNMENT HAS COMPLIED WITH THE PROCEDURAL REQUIREMENTS FOR IMPLEMENTING THIS NOTICE TO THE PUBLIC.

THE COURT: WE WILL HEAR FROM THE WITNESSES, AND THEN, OF COURSE, MR. CLEARY CAN ADDRESS THAT IN CLOSING IF IT DOESN'T COME THROUGH THE RESPONSES OF THE WITNESSES.

MR. THOMAS: THANK YOU.

THE COURT: BRIEFLY. WOULD YOU LIKE TO CALL YOUR FIRST WITNESS?

MR. CLEARY: YES. YOUR HONOR, THE GOVERNMENT CALLS MR. TANNIS FROM THE UNITED STATES SECRET SERVICE.

THE COURT: ALL RIGHT.

MR. CLEARY: YOUR HONOR, IF I MAY CONFER WITH MR. TANNIS BRIEFLY BEFORE HE TAKES THE STAND, JUST FOR 30 SECONDS, ABOUT SOME OF THE POINTS, UNEXPECTED POINTS THAT MR. THOMAS -- THAT I DON'T KNOW IF HE'S READY TO ADDRESS OR NOT.

THE COURT: WELL, WHY DON'T WE JUST LET HIM TESTIFY. BECAUSE IT IS A LITTLE UNUSUAL, AS YOU KNOW, FOR THE COUNSEL TO TALK TO THE IMPENDING WITNESS IMMEDIATELY BEFORE HE SPEAKS.

(LEONARD JAMES TANNIS, GOVERNMENT'S WITNESS, SWORN)

THE COURT: GOOD AFTERNOON.

THE WITNESS: GOOD AFTERNOON.

DIRECT EXAMINATION

BY MR. CLEARY:

Q PLEASE STATE YOUR NAME.

A MY NAME IS LEONARD JAMES TANNIS. [redacted]

Q MR. TANNIS, WHAT DO YOU DO FOR A LIV[redacted]

A I'M A SPECIAL AGENT WITH THE UNITED STATES SECRET SERVICE. MY CURRENT POSITION IS DEPUTY ASSISTANT DIRECTOR, WHITE HOUSE SECURITY COORDINATOR.

Q HOW LONG HAVE YOU WORKED FOR THE SECRET SERVICE?

A FOR 19-AND-A-HALF YEARS.

Q AND OF THOSE 19-AND-A-HALF YEARS, MR. TANNIS, HOW MANY OF THOSE YEARS HAVE BEEN DEVOTED TO PERSONNEL PROTECTION AND PERSONNEL SECURITY?

A APPROXIMATELY 12 OR 13.

Q 12 OR 13 YEARS?

A YES, SIR.

Q MR. TANNIS, WHAT IS YOUR ROLE WITH RESPECT TO THE SECURITY PRECAUTIONS FOR THE SUMMIT MEETING BETWEEN PRESIDENT BUSH AND PRESIDENT GORBACHEV?

A WELL, BASICALLY, AS THE WHITE HOUSE SECURITY COORDINATOR, I'M THE RANKING SECRET SERVICE PERSON IN RESIDENCE THERE AT THE WHITE HOUSE, AND I COORDINATE AND FACILITATE INFORMATION BETWEEN ALL OF OUR DIVISIONS AT THE WHITE HOUSE.

Q OKAY.

MR. CLEARY: YOUR HONOR, MAY I HAND THE WITNESS A COPY OF THE MAP?

THE COURT: YOU MAY.

BY MR. CLEARY:

Q MR. TANNIS, SHOWING YOU WHAT'S BEEN MARKED AS EXHIBIT 1, AND I CAN REPRESENT THAT THIS IS A PHOTOCOPY OF A DOCUMENT OF PLAINTIFFS' PAPERS, WILL YOU PLEASE DESCRIBE FOR US, WITHOUT DIVULGING ANY CONFIDENTIAL ASPECTS OF THE SECURITY PRECAUTIONS, PLEASE DESCRIBE FOR US THE SECURITY ARRANGEMENTS FOR LAFAYETTE PARK WITH RESPECT TO PRESIDENT GORBACHEV'S VISIT.

A BASICALLY, AS YOU LOOK AT THE MAP, THERE IS A SHADED AREA ON THE SOUTH SIDE OF THE PARK ABUTTING PENNSYLVANIA AVENUE. MY UNDERSTANDING IS THIS SHADED AREA IS BROKE UP IN TWO QUADRANTS, THE SOUTHWEST QUADRANT AND SOUTHEAST QUADRANT. FOR SECURITY PROCEDURES, WHAT WE ARE ATTEMPTING TO DO IS MOVE PEOPLE ABOVE THE FENCE LINE, OR NORTH TO THE FENCE LINE ON THE NUMBER OF

OCCASIONS THAT PRESIDENT GORBACHEV ARRIVES AT THE WHITE HOUSE VIA PENNSYLVANIA AVENUE. AT SUCH TIME AS HE'S INTO THE COMPLEX, THEY WILL THEN BE ALLOWED BACK INTO THE AREA.

Q WOULD THAT INCLUDE MOTORCADES INVOLVING MRS. GORBACHEV?

A YES, SIR, IT WOULD.

Q WHAT IS THE REASON TO NEED AN AREA LIKE THIS WITHOUT ANY PEOPLE IN IT?

A BASICALLY, THIS PROVIDES US WITH A BUFFER ZONE IN ORDER TO PROVIDE THE OFFICERS AND THE AGENTS WITH SOME REACTION TIME TO ANY TYPE SITUATION THAT MAY OCCUR. IT ALSO PROVIDES US WITH TIME, ONCE THE PEOPLE ARE REMOVED TO THE NORTH SIDE OF THE FENCE LINE, TO BRING OUR K-9 DOGS THROUGH AND SWEEP THE AREA TO MAKE SURE NOTHING HAS BEEN LEFT BEHIND.

THE COURT: "NOTHING HAS BEEN LEFT BEHIND." NOTHING DETRIMENTAL?

THE WITNESS: YES, MA'AM. AS AN EXPLOSIVE DEVICE OR OF A THREATENING NATURE.

BY MR. CLEARY:

Q AND WITH RESPECT TO THE THINKING PROCESS FOR DECIDING TO LEAVE THIS AREA OPEN OR TO MAKE SECURITY ARRANGEMENTS FOR A VISITING DIGNITARY, COULD YOU EXPLAIN TO US HOW THE DECISION IS ARRIVED AT AS TO WHETHER THIS AMOUNT OF SECURITY IS TOO LAX OR TOO STRICT, OR HOW THAT'S ARRIVED AT?

A BASICALLY, THAT DEPENDS ON OUR INTELLIGENCE INFORMATION. AND BECAUSE OF OUR EXPERIENCE IN THIS FIELD, WE JOINTLY AGREE

WITH THE UNITED STATES PARK POLICE ON HOW TO HANDLE EACH SITUATION ON A CASE-BY-CASE BASIS.

Q COULD YOU DESCRIBE FOR US THE AGENCIES INVOLVED IN REACHING THAT KIND OF JUDGMENT? IS IT JUST THE SECRET SERVICE OR --

A PRETTY MUCH THE JURISDICTIONS SPEAK: OURSELVES, THE UNITED STATES PARK POLICE, METROPOLITAN POLICE DEPARTMENT, BECAUSE OF THE JURISDICTIONAL BOUNDARIES IN THE AREA.

Q AND AGAIN WITH REFERENCE TO THE MAP, ARE THESE -- WELL, WITHOUT REFERENCE TO THE MAP, ARE THESE SECURITY PRECAUTIONS IN THIS CASE FOR THE GORBACHEV VISIT DIRECTED AT SPECIFIC PEOPLE OR TO AREAS OF LAND? I MEAN COULD YOU EXPLAIN THAT A LITTLE BIT FOR US?

A BASICALLY, IT'S A LAND ISSUE. WE HAVE NUMEROUS GROUPS DEMONSTRATING AT THAT TIME. AS I RECALL THE LAST FIGURE, THERE WERE 10 OR 11 DIFFERENT GROUPS AT THE TIME, AND IT'S NOT TARGETED AT ANY SPECIFIC PERSON OR GROUP.

Q IS IT TARGETED AT THESE PARTICULAR PLAINTIFFS?

A NO, SIR.

Q TO YOUR KNOWLEDGE, ARE THESE THE SAME PRECAUTIONS THAT WERE USED IN 1987?

A TO MY KNOWLEDGE, THEY ARE.

Q AND ARE YOU AWARE OF ANY PROBLEMS THAT AROSE IN 1987 WITH THE SECURITY PRECAUTIONS IN LAFAYETTE PARK?

A NO, SIR, I AM NOT.

Q OKAY. MY FINAL QUESTION, MR. TANNIS, RELATES TO AN ISSUE

ABOUT PARKING ON THE NORTH SIDE OF PENNSYLVANIA AVENUE AND WHAT, IN YOUR JUDGMENT, THE IMPACT WOULD BE ON SECURITY IF THE COURT WERE TO ORDER THAT NO PARKING WOULD BE -- OR NO VEHICLES WOULD BE ALLOWED TO OBSTRUCT SIGNS ALONG THE SOUTHERN PART OF THE PARK, OR IN OTHER WORDS, IF THE ZONE ALONG THE NORTHERN PART OF PENNSYLVANIA AVENUE WOULD BE FREE OF CARS DURING ANY OF THESE MOTORCADES. DO YOU UNDERSTAND WHAT I'M GETTING AT, THE QUESTION?

A NO. CAN YOU REPEAT IT?

Q OKAY. MY QUESTION IS: TO WHAT EXTENT WOULD IT IMPACT THE SECURITY ARRANGEMENTS FOR MOTORCADES INVOLVING SECRETARY GORBACHEV -- OR PRESIDENT GORBACHEV TO HAVE -- TO KEEP FREE OF CARS THE NORTH LANE OF PENNSYLVANIA AVENUE? WOULD THAT HAVE AN IMPACT ON THE SECURITY ARRANGEMENTS?

A IT COULD.

Q AND WOULD THAT IMPACT BE ADVERSE?

A YES, IT WOULD.

Q COULD YOU EXPLAIN WHAT YOU MEAN?

A WELL, BASICALLY, THOSE VEHICLES ARE RESPONSE VEHICLES, AND THEY ALSO PROVIDE US AN AVENUE OF EGRESS IN AN EMERGENCY AS WE COME OUT OF THE WHITE HOUSE GROUNDS. THEY COULD PROVIDE US COVER TO ESCAPE AND FLEE AT A CERTAIN TIME.

MR. CLEARY: YOUR HONOR, IF I COULD CONFER WITH MY CO-COUNSEL VERY BRIEFLY.

THANK YOU, MR. TANNIS.

THE COURT: LET ME ASK YOU A QUESTION OR TWO IF I MAY, SIR.

THE LENGTH OF TIME THAT YOU BELIEVE THAT YOU NEED TO HAVE ACCESS, AS YOU HAVE DESCRIBED, TO THESE PARTICULAR AREAS OF PENNSYLVANIA AVENUE AND TO MOVE THE PEOPLE BACK, AS TO EACH MOTORCADE GOING IN, COMING OUT, ABOUT HOW MUCH TIME DO YOU BELIEVE YOU NEED PRIOR TO THE EXIT OR ENTRANCE OF A MOTORCADE TO -- I DON'T WANT TO USE THE WORD CLEAR THE AREA, BUT YOU UNDERSTAND THE TERM.

THE WITNESS: YES, MA'AM. BASICALLY, YOUR HONOR, I THINK THAT, FROM MY EXPERIENCE, WE NEED THE AMOUNT OF TIME THAT IT TAKES TO RENDER THAT AREA SAFE.

THE COURT: WHICH IS APPROXIMATELY, BASED ON YOUR EXPERIENCE?

THE WITNESS: FORTY-FIVE MINUTES TO AN HOUR, APPROXIMATELY.

THE COURT: ALL RIGHT.

DO YOU CONSIDER THESE MATTERS THAT YOU ARE SEEKING TO UNDERTAKE AT THIS TIME IN THE NATURE OF EMERGENCY ACTION? OR TO PUT IT ANOTHER WAY, WAS THERE A REASON WHY YOU DIDN'T GO THROUGH THE ADMINISTRATIVE PROCEDURE ACT SUCH AS MR. THOMAS IS QUESTIONING? IF YOU KNOW.

THE WITNESS: I DON'T KNOW, MA'AM.

THE COURT: ALL RIGHT.

IF I UNDERSTOOD YOUR TESTIMONY, YOU REACHED YOUR

DETERMINATION AS TO WHAT TYPE OF SECURITY WAS NECESSARY HERE IN JOINT CONSULTATION WITH UNITED STATES PARK POLICE AND BASED ON THE INTELLIGENCE SOURCES THAT YOU HAD THAT INDICATED TO YOU WHAT WAS NECESSARY, IN YOUR UNDERSTANDING AND ACCORDING TO YOUR EXPERIENCE, TO DO THAT WOULD BEST SECURE THE SECURITY OF A VISITING HEAD OF STATE AND HIS WIFE. IS THAT RIGHT?

THE WITNESS: OF THIS PARTICULAR STATURE, YES, MA'AM.

THE COURT: ALL RIGHT. I'M NOT TRYING TO PUT WORDS IN YOUR MOUTH, BUT I WAS TRYING TO SUM UP WHAT I BELIEVE YOU HAD JUST SAID.

THE WITNESS: ABSOLUTELY.

THE COURT: ALL RIGHT. MR. THOMAS, DO YOU HAVE AN INQUIRY OR TWO OF MR. TANNIS?

MR. THOMAS: YES, YOUR HONOR.

THE COURT: ALL RIGHT.

CROSS EXAMINATION

BY MR. THOMAS:

Q GOOD AFTERNOON, MR. TANNIS.

A GOOD AFTERNOON.

Q COULD YOU TELL ME WHOSE IDEA IT WAS TO CLOSE THIS SECTION OF THE PARK?

A WELL, PRETTY MUCH, IN THIS SPECIFIC INSTANCE, AFTER WE EVALUATED THE INTELLIGENCE AND THINGS OF THAT SUCH, AND THE SUCCESS OF THE PREVIOUS VISIT IN '87, I THINK IT WAS JUST A MUTUAL AGREEMENT AMONG THE PEOPLE AT THE MEETING.

Q NO SPECIFIC PERSON MADE THE DECISION?
A ~~NOT~~ THAT I CAN RECALL, NO, SIR. NOT TO MY KNOWLEDGE.
Q WELL, THE NOTICE HERE, DO YOU KNOW WHO INSTRUCTED THAT THIS NOTICE SHOULD BE WRITTEN?
A NO, SIR, I DO NOT.
Q DO YOU KNOW WHETHER ANY -- WERE THERE ANY MEETINGS TO DISCUSS CLOSING THE PARK?
A NO, SIR. NONE THAT I ATTENDED.
Q DO YOU KNOW IF ANY DOCUMENTS WERE GENERATED WITH REGARD TO THESE MEASURES?
A NOT THAT I'M AWARE OF.
Q DO YOU KNOW WHETHER THE NOTICE WAS PUBLISHED IN THE FEDERAL REGISTER -- I'M SORRY. MAYBE THAT WAS ALREADY ASKED.
A NO, SIR, I DON'T.
Q WERE THERE ANY DISCUSSIONS ABOUT CLOSING THE PARK BEFORE YOU DECIDED TO DO IT?
A I'M ASSUMING THERE WERE BY SOME OF THE SUBORDINATES, BUT NOT -- I DIDN'T ATTEND ANY OF THE MEETINGS CONCERNING THE DECISION.
Q DO YOU KNOW WHEN THE MEETINGS WOULD HAVE HAPPENED? WHEN DI[D] YOU -- LET ME REPHRASE THE QUESTION. WHEN DID YOU FIRST BEGIN -- WHEN DID YOU FIRST BECOME AWARE THAT MR. GORBACHEV WOULD BE VISITING ON MAY 31ST?
A A FEW MONTHS AGO.
Q A FEW MONTHS AGO. AND WHEN DID YOU FIRST START BECOMING

CONCERNED WITH WHAT PROVISIONS YOU WOULD MAKE FOR HIS SECURITY?
A APPROXIMATELY A MONTH OR SO AGO.
Q WHO DECIDED TO INITIATE THE PROCESS OF MAKING DECISIONS AS TO WHAT SECURITY MEASURES WOULD BE IMPLEMENTED?
A THE DECISION-MAKING PROCESS FOR THE SECURITY MEASURES FOR PRESIDENT GORBACHEV HIMSELF WERE MADE BY AGENTS IN OUR DIGNITARY PROTECTIVE DIVISION.
Q WHEN?
A I CAN ONLY GUESS. APPROXIMATELY A MONTH OR TWO AGO.
Q IT COULD HAVE BEEN LONGER?
A I HAVE NO WAY OF KNOWING.
Q YOU'VE BEEN IN YOUR PRESENT POSITION FOR 12 YEARS, DID YOU SAY?
A NO, SIR. I'VE BEEN IN MY CURRENT POSITION FOR ABOUT A YEAR.
Q OH, I'M SORRY. AND YOU'RE CONCERNED WITH SECURITY IN THE WHITE HOUSE AREA AND AROUND THE AREA OF THE WHITE HOUSE?
A YES, SIR. THE COMPLEX.
Q DO YOU KNOW WHO I AM?
A NO, SIR.
Q HAVE YOU EVER SEEN SECRET SERVICE OFFICERS WALKING DOGS ALONG THE SIDEWALK IN FRONT OF THE WHITE HOUSE?
A YES, SIR.
Q YOU KNOW THAT THAT GOES ON. WOULD THERE BE ANY REASON WHY YOU COULDN'T -- BEFORE MR. GORBACHEV'S MOTORCADE COMES BY, WOULD THERE BE ANY REASON THAT YOU CAN SEE THAT YOU COULDN'T USE DOGS

TO SWEEP THE AREA WITHOUT TAKING EVERYBODY OFF THE LAFAYETTE PARK SIDEWALK, AS YOU DO ON THE WHITE HOUSE SIDEWALK WITH THE DOGS THAT GO THERE WHEN THE SIDEWALKS AREN'T CLOSED? IS THERE ANY REASON WHY YOU COULDN'T HAVE DOGS SWEEP THE AREA WITHOUT CLOSING DOWN THE SIDEWALK AS YOU PROPOSE TO DO HERE?

A THERE'S NO WAY THOSE DOGS CAN SWEEP IF PEOPLE ARE THERE.

THE COURT: ANYTHING FURTHER, MR. THOMAS, OF THIS WITNESS?

MR. THOMAS: YEAH, A FEW OTHER QUESTIONS.

THE COURT: ALL RIGHT. BRIEFLY, IF YOU WILL, SIR, BECAUSE I HOPE WE HAVE TIME TO GET TO THE NEXT WITNESS.

BY MR. THOMAS:

Q CAN YOU GIVE ME AN EXAMPLE OF WHY YOU WOULD NEED A BUFFER ZONE -- WELL, LET ME ASK YOU THIS FIRST. APART FROM MR. GORBACHEV, DO YOU KNOW OF ANY OTHER HEAD OF STATE WHOSE VISIT HAS RESULTED IN CLOSING DOWN THIS SECTION OF THE PARK?

A I HAVE NO PERSONAL KNOWLEDGE OTHER THAN ON ONE OTHER OCCASION I WAS TOLD THAT THE SAME SITUATION OCCURRED DURING THE SADAT-BEGIN VISIT DURING THE ADMINISTRATION OF PRESIDENT CARTER.

Q ARE YOU GOING TO CLOSE -- YOU DON'T KNOW THAT PERSONALLY, YOU TOLD ME.

A NO, SIR.

Q ARE YOU GOING TO CLOSE ALL THE SIDEWALKS ALONG MR. GORBACHEV'S ROUTE?

A NO, SIR.

Q WHY NOT?
A WELL, BECAUSE WE FEEL WE'RE MOST VULNERABLE RIGHT IN FRONT OF THE WHITE HOUSE THERE ON PENNSYLVANIA AVENUE, WHEN THE MOTORCADE HAS TO SLOW TO A VERY SLOW PACE IN ORDER TO MAKE THE TURN INTO THE GATE. AND ALSO THE VULNERABILITY OF THE COMPLEX ITSELF WHEN THE GATES ARE WIDE OPEN WAITING FOR THAT ARRIVAL.

DURING THE NORMAL TRANSVERSE THROUGH THE CITY, THEY'RE GOING AT THE SPEED LIMIT, AND WE FEEL THAT THAT SPECIFIC THREAT ISN'T THERE.

THE COURT: WE'RE GOING TO MOVE ON AND HEAR VERY BRIEFLY FROM THE NEXT AND LAST WITNESS. YOUR SELECTION.

MR. CLEARY: THANK YOU, YOUR HONOR. THE GOVERNMENT CALLS MAJOR CARL HOLMBERG OF THE UNITED STATES PARK POLICE.

THE COURT: ALL RIGHT. THANK YOU, SIR.

THE WITNESS: THANK YOU.

THE COURT: THIS GENTLEMAN'S LAST NAME, MR. CLEARY?

MR. CLEARY: HOLMBERG, YOUR HONOR. H O L M B E R G.

THE COURT: ALL RIGHT.

(CARL R. HOLMBERG, GOVERNMENT'S WITNESS, SWORN)

THE COURT: GOOD AFTERNOON.

THE WITNESS: GOOD AFTERNOON.

MR. CLEARY: YOUR HONOR, I WOULD LIKE TO HAND THE SAME DOCUMENT TO MAJOR HOLMBERG.

THE COURT: YES.

DIRECT EXAMINATION

BY MR. CLEARY:

Q PLEASE STATE YOUR NAME.

A CARL REGIS HOLMBERG.

Q MAJOR HOLMBERG, WHAT DO YOU DO FOR A LIVING?

A I'M A MAJOR WITH THE UNITED STATES PARK POLICE.

Q HOW LONG HAVE YOU WORKED FOR THE PARK POLICE?

A APPROXIMATELY 24-AND-A-HALF YEARS.

Q MAJOR HOLMBERG, WHAT IS YOUR ROLE WITH RESPECT TO THE SECURITY PRECAUTIONS FOR THE SUMMIT MEETING BETWEEN PRESIDENT BUSH AND PRESIDENT GORBACHEV?

A I'LL BE THE COMMANDER OF FORCES IN THE FIELD FOR THE UNITED STATES PARK POLICE DURING THE VISIT.

Q OKAY. WITH REFERENCE TO THE DOCUMENT IN FRONT OF YOU, WHICH IS THE NOTICE TO THE PUBLIC AND THE MAP, PLEASE EXPLAIN FOR US, WITHOUT DIVULGING ANY CONFIDENTIAL ASPECT OF THE SECURITY PRECAUTIONS, PLEASE EXPLAIN TO US WHAT THOSE SECURITY PRECAUTIONS ARE ON THE SECOND PAGE OF THAT DOCUMENT.

A THE SHADED AREA OF THE MAP INDICATES THAT PORTION OF THE PARK WHICH WE PROPOSE TO CLEAR FOR SPECIFIC OCCASIONS THAT OCCUR AT EITHER THE NORTHWEST GATE OR THE NORTHEAST GATE AT THE WHITE HOUSE.

MR. THOMAS: YOUR HONOR, WE'VE ALREADY HEARD THIS TESTIMONY. WE COULD GO A LITTLE FURTHER, I THINK. I WOULD OBJECT TO THIS AS BEING REPETITIOUS.

THE COURT: OBJECTION OVERRULED. JUST BRIEFLY, THOUGH.

BY MR. CLEARY:

Q AND WHAT WILL HAPPEN WHEN A MOTORCADE COMES OR GOES FROM ONE OF THE NORTH GATES OF THE WHITE HOUSE COMPLEX?

A DEPENDING UPON WHICH GATE, WE WOULD CLOSE THAT SECTION OF PARK OPPOSITE THE GATE. IN OTHER WORDS, IF IT WAS THE NORTHWEST GATE, WE WOULD CLOSE THE SOUTHWEST PORTION OF THE PARK; THE NORTHEAST GATE, THE SOUTHEAST SECTION OF THE PARK.

Q AND BY CLOSING DOWN A PART OF THE PARK, WHAT DO YOU MEAN BY THAT?

A CLOSING IT FROM THE GENERAL PUBLIC AND ALL PERSONS IN THAT SHADED AREA; AND THEN, USING OUR K-9, WE WOULD CONDUCT WHAT WE CALL A BOMB SWEEP OF THE AREA.

Q OKAY. IF YOU WOULD FLIP TO THE FIRST PAGE OF THIS DOCUMENT, COULD YOU DESCRIBE FOR US, PLEASE, WHAT THIS DOCUMENT IS? COULD YOU IDENTIFY THIS DOCUMENT FOR US?

A YES, SIR. THIS IS THE NOTICE THAT THE ASSOCIATE REGIONAL DIRECTOR FOR WHITE HOUSE LIAISON HAS SENT OUT TO THOSE PEOPLE WHO WILL BE -- OR WHO HAVE APPLIED FOR DEMONSTRATION PERMITS FOR LAFAYETTE PARK.

Q ARE YOU AWARE OF HOW THIS NOTICE WAS DISSEMINATED?

A THIS NOTICE WAS DISSEMINATED BY THE MEMBERS OF THE STAFF OF THE WHITE HOUSE LIAISON. MR. MCDANIEL'S STAFF SUPPLIES THIS LETTER TO THE PUBLIC EVENTS SECTION OF THE NATIONAL CAPITAL REGION OF THE PARK SERVICE.

Q WAS A SIMILAR NOTICE USED IN 1987?
A YES, SIR. THE ONLY DIFFERENCE WOULD HAVE BEEN THE DATES. IT'S SPECIFICALLY THE SAME NOTICE THAT WAS USED IN 1987.
Q OKAY. AND WAS IT THE SAME MAP ATTACHED TO THE BACK?
A YES, SIR. SAME MAP.
Q OKAY. AND TO YOUR KNOWLEDGE, ARE THE 1987 SECURITY PRECAUTIONS THE SAME AS THE 1990 SECURITY PRECAUTIONS?
A FOR LAFAYETTE PARK, YES, SIR.
Q COULD YOU DESCRIBE FOR THE COURT THE EXPERIENCE WITH THE 1987 SECURITY PRECAUTIONS?
A DURING THE 1987 VISIT, WE HAD APPROXIMATELY TEN SEPARATE DEMONSTRATIONS OCCURRING UNDER PERMIT IN THE PARK. UPON ARRIVALS AND DEPARTURES, THE INDIVIDUAL GROUPS WOULD RUSH DOWN TO THAT PARTICULAR SECTION OF THE PARK WHERE EITHER THE ARRIVAL OR THE DEPARTURE WAS OCCURRING, AND STOPPED ONLY BY THE SNOW FENCE THAT WE HAD ERECTED IN THE LAFAYETTE PARK.
Q SO NOW THE DOTTED LINE THERE WAS A SNOW FENCE?
A YES, SIR. THE DOTTED LINE INDICATES A SNOW FENCE. THE ONLY TIME THE SIDEWALKS ARE CLOSED ARE DURING THOSE ARRIVALS AND DEPARTURES.
Q WERE THERE ANY INCIDENTS IN 1987?
A NO, SIR.
Q WAS THERE ANY DAMAGE TO ANY SIGNS LEFT IN THE SHADED AREA IN 1987?
A TO THE BEST OF MY KNOWLEDGE, THERE WAS NONE.

Q OKAY. LOOKING AT THE MAP, MAJOR HOLMBERG, BELOW THE SHADED REGION THERE'S A DEPICTION OF PENNSYLVANIA AVENUE?
A YES, SIR.
Q AND I HAVE A QUESTION ABOUT WHAT IMPACT IT WOULD HAVE ON THE SECURITY PRECAUTIONS IF THE NORTHERN LANE OF PENNSYLVANIA AVENUE WAS SHUT OFF TO VEHICLES OR WAS -- IF THERE WAS A PROHIBITION ON ANY PARKED VEHICLES OR ANY VEHICLES IN THAT LANE, WHETHER, IN YOUR OPINION, THAT WOULD IMPACT THE SECURITY PRECAUTIONS IN ANY WAY.
A THAT WOULD IMPACT THE SECURITY PRECAUTIONS THAT WE HAVE.
Q HOW WOULD IT IMPACT?
A THE VEHICLES ARE USED TO TRANSPORT OFFICERS TO AND FROM THIS AREA TO OTHER AREAS WHERE WE ALSO HAVE DEMONSTRATIONS, BESIDES LAFAYETTE PARK. THEY ARE NECESSARY FOR THOSE OFFICERS TO HAVE IMMEDIATE RESPONSE, SO THAT WE CAN EFFECTIVELY MOVE FROM ONE AREA TO ANOTHER. IN ADDITION TO THAT, IT'S SIMPLY ANOTHER BARRIER. WE KNOW WHAT'S IN THOSE CARS, AND IT'S NOT JUST OPEN TO THE GENERAL PUBLIC.
Q THANK YOU, MAJOR HOLMBERG.
THE COURT: MR. THOMAS? VERY BRIEFLY, WITHIN THE CONFINES OF THE DIRECT EXAMINATION. CROSS-EXAMINATION.

CROSS-EXAMINATION

BY MR. THOMAS:
Q GOOD AFTERNOON, MAJOR HOLMBERG. DO YOU KNOW WHO MADE THIS DECISION TO CLOSE THE PARK?

MR. CLEARY: YOUR HONOR, I OBJECT TO THE CHARACTERIZATION AS FAR AS CLOSURE OF THE PARK. THE PARK IS NOT CLOSED

THE COURT: YOU MIGHT REPHRASE IT A BIT, MR. THOMAS, RECEIVE WHATEVER ANSWER YOU MIGHT NEED.

MR. THOMAS: I DON'T WANT TO WASTE TIME, YOUR HONOR, BUT I DON'T HAVE THE -- IT SAYS THE PARK WILL BE CLOSED TO THE PUBLIC.

THE COURT: IT SAID THE SOUTHERN PORTION.

MR. THOMAS: OH!

BY MR. THOMAS:

Q DO YOU KNOW WHO MADE THE DECISION TO CLOSE THE SOUTHERN PORTION OF LAFAYETTE PARK?

A THIS DECISION IS BASICALLY THAT OF MR. MCDANIEL. HOWEVER, IT WAS DONE AT THE REQUEST OF BOTH THE SECRET SERVICE AND THE UNITED STATES PARK POLICE.

Q SO THAT THERE WERE MEETINGS HELD TO DISCUSS THE CLOSURE?

A THERE WERE SOME BRIEF ON-SITE MEETINGS HELD PRIOR TO THIS NOTICE GOING OUT.

Q WAS THE QUESTION OF FIRST AMENDMENT RIGHTS RAISED AT ANY OF THOSE BRIEF MEETINGS?

MR. CLEARY: YOUR HONOR, I OBJECT TO THIS WITNESS BEING ASKED TO ANALYZE WHETHER THE FIRST AMENDMENT WAS DISCUSSED AT THE MEETING.

THE COURT: IT MAY NOT HAVE BEEN DISCUSSED IN PRECISELY THOSE TERMS, MR. THOMAS. SO YOU MIGHT WANT TO ASK MORE

QUESTIONS THAT BRING IT TO THAT POINT.

MR. THOMAS: I'LL REPHRASE THE QUESTION, IF I MAY.

BY MR. THOMAS:

Q WAS THERE ANY DISCUSSION AS TO HOW YOU MIGHT IMPLEMENT THE LEAST RESTRICTIVE MEANS TO ACHIEVE YOUR SECURITY CONCERNS?

A YES, SIR. I THINK SOME OF THE DISCUSSIONS DURING THE MEETINGS ADDRESSED CLOSING THE ENTIRE PARK, CLOSING HALF OF THE PARK ON A LATERAL LINE FROM EAST TO WEST. AND WE BROUGHT IT BACK DOWN TO WHAT WE DID -- WHAT WE ACCOMPLISHED IN 1987, AND THAT IS, CLOSING ONLY THAT VERY SMALL PORTION OF THE PARK ABSOLUTELY NECESSARY FOR OUR SECURITY CONCERNS FOR VERY SHORT DURATIONS OF TIME SO THAT THOSE PEOPLE WHO WISHED TO CONTINUE THEIR FIRST AMENDMENT ACTIVITIES COULD COME BACK INTO THE AREA WHERE THEY HAD A PERMIT.

Q WHO TOOK PART IN THESE DISCUSSIONS?

A THE DISCUSSION WAS BASICALLY -- I'M TRYING TO REMEMBER JOHN'S LAST NAME. HIS LAST NAME ESCAPES ME, BUT IT WAS THE SECRET SERVICE AGENT IN CHARGE OF THE LAFAYETTE PARK AND MYSELF.

Q SO AS FAR AS YOU KNOW, THE ONLY MEETINGS CONCERNING THIS CLOSURE OF THE SOUTHERN SECTION OF THE PARK WERE BETWEEN YOU AN( A SECRET SERVICE AGENT?

A THAT'S RIGHT. AND THEN, AFTER THE ON-SITE MEETINGS, THERE WAS TELEPHONIC COMMUNICATION BETWEEN MYSELF AND MR. MCDANIEL, WHERE WE REQUESTED THE SAME NOTICE THAT WE HAD IN 1987.

Q LET ME ASK YOU, ARE YOU AWARE OF ANY REASON WHY DOGS

COULDN'T BE USED TO SWEEP THE AREA WITHOUT CLOSING THE SIDEWALK?
A WITHOUT CLOSING THE SIDEWALK, WE WOULD HAVE TO HAVE THE DOGS SEARCH PEOPLE. THAT'S NOT AN ACCEPTABLE RISK. WE DON'T NORMALLY SEARCH PEOPLE WITH DOGS.
Q SO ARE YOU SAYING THAT IT WOULD BE OKAY FOR A PERSON TO HAVE A BOMB ON THEIR PERSON AND THEN THEY COULD MAYBE GO ON THE OTHER SIDE OF THE FENCE AND THE DOG COULD SWEEP THE SIDEWALK? WOULDN'T THEY BE ABLE TO THROW THE BOMB AT THE CAR?
A NO, SIR, I DIDN'T SAY IT WAS OKAY FOR ANYBODY TO HAVE A BOMB.
Q WELL, YOU SAID THAT -- I'M NOT TRYING -- I'M JUST TRYING TO UNDERSTAND. YOU SAID THAT YOU DIDN'T WANT TO SEARCH PEOPLE.
A WITH A DOG.
Q WITH A DOG.
A YES, SIR.
Q BUT YOU ARE CONCERNED WITH SECURITY, AREN'T YOU? ISN'T THAT THE CONCERN HERE?
A YES, SIR.
Q SO IF WE ASSUME THAT THERE'S A PERSON ON THE SIDEWALK WITH A BOMB AND THEN THE SIDEWALK GETS CLOSED DOWN SO HE HAS TO TAKE HIS BOMB ON THE OTHER SIDE OF THE FENCE, WHAT WOULD PREVENT THAT PERSON FROM THROWING HIS BOMB ONTO THE STREET? HE'S ONLY 75 FEET FROM THE STREET.
A SIR, WE HAVE OTHER WAYS OF SURVEILING PERSONS OTHER THAN WITH K-9. SO --

Q I'M SURE YOU DO, BUT I'M JUST ASKING YOU --

MR. CLEARY: YOUR HONOR, I'M GOING TO OBJECT TO SPECULATION.

BY MR. THOMAS:

Q WHY YOU DON'T WANT TO HAVE A DOG ON THE SIDEWALK, SO THE OTHER WAYS ARE NOT IMPORTANT -- WHY YOU HAVE TO CLOSE THE SIDEWALK TO HAVE THE DOG SEARCH THE PEOPLE.

WITH RESPECT TO NEEDING THE CARS TO MOVE AROUND FROM ONE PLACE TO ANOTHER, COULDN'T YOU PARK THEM ON THE SOUTH SIDE OF THE STREET?

A THAT WOULD BLOCK THE ENTRANCEWAYS.

Q WELL, I'M NOT SUGGESTING THAT YOU HAVE TO PARK THEM IN FRONT OF THE DRIVEWAY. BUT COULDN'T YOU PARK THEM ON THE SOUTH SIDE OF THE STREET AND NOT IN FRONT OF THE DRIVEWAYS AND STILL BE ABLE TO GET BACK AND FORTH PRETTY EASILY?

A IT'S BEEN OUR EXPERIENCE THAT MOST OF OUR MASS ARRESTS OCCUR ON THE SOUTH SIDE OF THE 1600 BLOCK OF PENNSYLVANIA AVENUE. IF I PARK ALL MY CARS OVER THERE, THEN I CAN'T GET THE BUSES, THE TRANSPORT VEHICLES, AND THE PROCESSING TEAMS IN TO TAKE CARE OF THOSE MASS ARRESTS.

Q ISN'T THE SOUTH SIDEWALK GOING TO BE CLOSED, ALSO?

A CERTAIN PORTIONS OF IT.

Q THE PORTION IN FRONT OF THE WHITE HOUSE. ISN'T THAT GOING TO BE CLOSED?

A NOT IN ITS ENTIRETY AND NOT AT ALL TIMES. NO, SIR.

Q THEN WOULD IT BE ALL RIGHT FOR US TO HAVE OUR SIGNS ON THE WHITE HOUSE SIDEWALK?

A NO, SIR. THAT WOULD BE A VIOLATION OF OUR REGULATIONS.

Q ASSUMING THE SIGNS WERE NOT VIOLATING ANY REGULATIONS. SIGNS ARE ALLOWED ON THE WHITE HOUSE SIDEWALK, AREN'T THEY?

A CERTAINLY.

Q SO ASSUMING THE SIGNS WERE -- ASSUMING WE HAD SIGNS THAT DIDN'T VIOLATE ANY REGULATION, WOULD YOU HAVE ANY OBJECTION TO US TAKING OUR SIGNS ONTO THE WHITE HOUSE SIDEWALK WHILE YOUR CARS -- AND THEN YOU WOULDN'T PARK YOUR CARS ON THE SOUTH SIDE; YOU COULD PARK YOUR CARS ON THE NORTH SIDE.

THE COURT: JUST A MOMENT, SIR.

MR. CLEARY: YOUR HONOR, I OBJECT. THIS IS AN INVITATION TO HAVE A LEGAL DEBATE WITH THIS WITNESS AS TO THE IMPACT --

THE COURT: OBJECTION SUSTAINED. WE ARE DEALING WITH A CASE IN CONTROVERSY THAT'S BEFORE US RIGHT NOW, MR. THOMAS; NOT ONE THAT MIGHT SPECULATIVELY HAPPEN IN THE FUTURE. EVERYTHING HAS TO BE LOOKED AT INDIVIDUALLY.

WHAT I WANT TO KNOW OF THIS MAJOR FROM THE UNITED STATES PARK POLICE, THIS GENTLEMAN, IS: WHAT WILL YOU DO, IF ANYTHING, SIR, TO SAFEGUARD THE SIGNS OF ANY AND ALL DEMONSTRATORS WHO ARE OUT THERE PRESENTLY IN LAFAYETTE PARK OR WHO MAY COME TO LAFAYETTE PARK BETWEEN NOW AND THE CONCLUSION OF THIS TRIP?

THE WITNESS: YES, MA'AM. WE PROPOSE TO DO BASICALLY THE SAME AS WE DID IN 1987, WHICH IS: WHILE WE'RE ASKING THE DEMONSTRATORS TO MOVE FROM THAT AREA THAT'S IN THE SHADE BACK BEHIND THE FENCE, WE WILL VIDEOTAPE ALL OF THOSE ACTIONS. WE WILL STATION OFFICERS ALONG THE SOUTH SIDEWALK TO ASSURE THAT, AS MUCH AS WE CAN, THAT THOSE SIGNS WILL NOT BE TAMPERED WITH. WE WILL ASK THEM TO TAKE ANY PERSONAL PROPERTY OF ANY VALUE WITH THEM SO THEY CAN PROTECT THAT. AND UNLESS I HAVE TO MOVE THOSE OFFICERS IN RESPONSE TO AN EMERGENCY, THEY WILL STAY DOWN THERE AND ASSURE AS BEST WE CAN THAT THE SIGNS WON'T BE TAMPERED WITH.

WE DID THIS IN 1987 AND WE HAD NO PROBLEMS THAT I'M AWARE OF.

THE COURT: MR. THOMAS, THAT'S ALL THE TESTIMONY I'M GOING TO TAKE AT THIS POINT. BUT I WILL LISTEN TO YOUR ARGUMENT IF YOU WISH TO HAVE THAT.

MR. THOMAS: I WOULD LIKE TO ASK TWO SHORT QUESTIONS, YOUR HONOR.

THE COURT: WHY DON'T YOU TELL ME WHAT THE QUESTIONS ARE.

MR. THOMAS: FIRST, I WOULD LIKE TO ASK THE MAJOR WHETHER OR NOT THE CARS BEING PARKED ON THE NORTH SIDE OF THE STREET WILL BLOCK OUR SIGNS, WILL OBSTRUCT -- TOTALLY OBSTRUCT THE VIEW OF OUR SIGNS FROM THE STREET.

THE COURT: IF THE MAJOR HAS THAT KNOWLEDGE WITHIN HIM HE CAN ANSWER THE QUESTION.

THE WITNESS: THIS IS THE FIRST TIME IN FIVE-AND-A-HALF YEARS THAT I'VE BEEN DEALING WITH -- SPECIFICALLY WITH DEMONSTRATIONS THAT ANYBODY HAS COMPLAINED ABOUT OUR CRUISERS BLOCKING THE SIGNS. IT SEEMS TO ME THAT I'VE SEEN THOSE SIGNS FROM THE OPPOSITE SIDE OF THE STREET EVEN WITH THE CRUISERS PARKED THERE.

THE COURT: IS YOUR ANSWER THAT IT WOULD NOT TOTALLY OBSCURE, AS MR. THOMAS HAS SUGGESTED?

THE WITNESS: THAT'S RIGHT.

THE COURT: AND WHAT'S YOUR SECOND QUESTION, MR. THOMAS?

MR. THOMAS: I THINK I WOULD LIKE TO FOLLOW UP ON THAT QUESTION, IF I MIGHT.

THE COURT: WHAT IS YOUR SECOND QUESTION, SIR?

MR. THOMAS: MY SECOND QUESTION IS: IF YOU CAN'T GUARANTEE THE SAFETY OF THE SIGNS AND THE OTHER THINGS ON THE SIDEWALK WHEN THE SIDEWALK IS CLOSED DOWN AND THERE'S NO ONE THERE BUT POLICE OFFICERS, WHY CAN'T YOU INSURE THE SAFETY OF THOSE THINGS?

MR. CLEARY: YOUR HONOR, IS THAT QUESTION PERMISSIBLE? I MEAN THAT WAS TENDERED TO THE COURT.

THE COURT: IF THE MAJOR UNDERSTANDS THE QUESTION, I'LL LET HIM ANSWER IT.

THE WITNESS: AS I SAID PREVIOUSLY, WE'LL TAKE EVERY REASONABLE EFFORT TO PROTECT THAT PROPERTY. THERE WILL BE

OFFICERS STATIONED DOWN THERE. HOWEVER, IF I HAVE AN EMERGENCY AND HAVE TO RELOCATE THOSE OFFICERS, THEN THEY WILL NO LONGER BE STATIONED THERE, AND I COULD NOT ABSOLUTELY GUARANTEE THAT AT THAT POINT.

MR. THOMAS: WELL, LET ME ASK --

THE COURT: SIR, THAT IS IT. NO FURTHER TESTIMONY. IN FACT, NORMALLY YOU DON'T HAVE TESTIMONY DURING A T.R.O., AND I DID IT IN ORDER TO LET YOU EXPLORE THE MATTER A LITTLE BIT BEYOND WHAT NORMALLY IS.

YOU MAY STEP DOWN, SIR.

I'LL ENTERTAIN ARGUMENT IF COUNSEL WISHES TO. AND SINCE YOU ARE ACTING AS COUNSEL, MR. THOMAS, WOULD YOU LIKE TO MAKE YOUR ARGUMENT IN BEHALF OF YOUR REQUEST FOR THE TEMPORARY RESTRAINING ORDER.

MR. THOMAS: YOUR HONOR, ALL I CAN SAY IS THAT I THINK IT'S CLEAR THAT THE GOVERNMENT DIDN'T COMPLY WITH THE REGULATIONS THAT ARE GOVERNING THEIR RIGHT TO EFFECT A CLOSURE OF THIS NATURE, THE A.P.A. AND 36 CFR 1.5. I THINK THAT'S QUITE CLEAR FROM THE TESTIMONY.

ALTHOUGH THERE'S BEEN TALK ABOUT -- AND WE'RE ALL IN A HURRY, I KNOW, BUT IF I HAD MORE OPPORTUNITY TO DEAL WITH THIS, WE WOULDN'T BE SO RUSHED TODAY,. AND THE ONLY REASON THAT IT'S SUCH A RUSH IS BECAUSE I DIDN'T LEARN ABOUT THIS UNTIL MAY 24TH.

AS FAR AS THE SECURITY CONCERNS GO, I DON'T THINK WE REALLY HEARD ANY, YOUR HONOR. WE HEARD THAT MR. GORBACHEV --

THIS IS THE ONLY PART OF THE CITY ALONG HIS ROUTE WHERE THE SIDEWALKS ARE GOING TO BE CLOSED DOWN, AND THEY'RE GOING TO BE CLOSED DOWN BECAUSE HE BECOMES VULNERABLE WHEN THE CAR SLOWS DOWN TO TURN INTO THE GATE AT THE WHITE HOUSE.

WE HAVE THIS BIG BUFFER ZONE, AND I DON'T UNDERSTAND, I DON'T SEE -- I DIDN'T HEAR ARTICULATED ANY REASONS FOR HAVING THE CARS PARKED ON THE NORTH SIDE OF THE STREET RATHER THAN ON THE SOUTH SIDE OF THE STREET. I THINK NOTWITHSTANDING WHAT THE MAJOR SAID, I THINK IT'S SELF-EVIDENT THAT IF CARS ARE PARKED IN FRONT OF SIGNS, SIGNS ARE OBSCURED. AND MR. TANNIS TESTIFIED THAT THEY NEEDED THE CARS ON THE SOUTH SIDE OF THE STREET IN CASE THEY HAD TO ESCAPE OR HAD TO MAKE A QUICK EGRESS. BUT I THINK THAT THEY COULD JUST AS EASILY ESCAPE OR MAKE A QUICK EGRESS IF THEIR CARS WERE PARKED ON THE SOUTH SIDE OF THE STREET.

IF THE PARK IS TO BE CLOSED DOWN, ALTHOUGH I PERSONALLY FEEL THAT IT HASN'T BEEN DONE IN ACCORDANCE WITH THE PRINCIPLES, THE RULES THAT HAVE BEEN LAID DOWN -- IF THE SECTION OF THE PARK HAS TO BE CLOSED DOWN, I THINK THAT THE VERY LEAST THAT CAN BE DONE IS TO LET THE POLICE PARK THEIR CARS ON THE OTHER SIDE OF THE STREET SO THAT AT LEAST OUR SIGNS WILL BE VISIBLE.

I THINK THAT THE PARK SHOULDN'T BE CLOSED DOWN, BECAUSE I THINK THAT IT'S QUITE POSSIBLE THAT MR. GORBACHEV MIGHT JUST DECIDE, "I REMEMBER THOSE PEOPLE THERE, I'VE HEARD ABOUT THEM, AND I'D LIKE TO STOP OFF AND SEE IF THEY'RE AS CRAZY AS

EVERYBODY SAYS", OR WHATEVER, YOU KNOW. I MEAN THEY'RE HERE TO TALK ABOUT NUCLEAR WEAPONS. THAT'S WHAT MR. REAGAN AND MR. GORBACHEV ARE GOING TO BE TALKING ABOUT. I DON'T KNOW IF YOU GOT A CHANCE TO LOOK AT OUR COMPLAINT THOROUGHLY --

THE COURT: OH, I READ YOUR COMPLAINT.

MR. THOMAS: I KNOW YOU'VE BEEN VERY BUSY AND YOU JUST GOT THIS AT NOON AND YOU'VE BEEN IN A TRIAL --

THE COURT: SIR, WHATEVER ELSE I MAY HAVE, I HAVE LOOKED AT YOUR COMPLAINT AND YOUR PAPERS AND YOUR SUPPLEMENTAL PAPERS.

MR. THOMAS: WELL, THEN YOU MIGHT BE FAMILIAR WITH THE PROPOSITION ONE IDEA WE HAVE. AND THIS IS SOMETHING THAT WE'RE TRYING TO PROMOTE, BOTH HERE IN THE SOVIET UNION. YOU SEE, WE HAVE A COPY OF IT WRITTEN IN RUSSIAN. WE HAVE PEOPLE -- YOU MAY RECALL ROBERT DORROUGH. HE WAS HERE BEFORE YOU ONCE, BACK IN 1984. HE'S OVER THERE NOW. HE TAUGHT HIMSELF TO SPEAK RUSSIAN, AND HE'S TALKING TO MEMBERS OF THE SUPREME SOVIET AND HE'S TRYING TO PROMOTE THE IDEA. MAYBE MR. GORBACHEV WILL BE INTERESTED IN THE IDEA.

AND I THINK THAT THE PARK SHOULDN'T BE CLOSED BECAUSE IF MR. GORBACHEV DOES WANT TO COME AND TALK TO US, HE SHOULD BE FREE TO ASSOCIATE WITH US. IF THE PARK HAS TO BE CLOSED, DEPRIVING US OF THAT POSSIBILITY FOR ASSOCIATION WITH MR. GORBACHEV, THEN I THINK AT LEAST OUR SIGNS SHOULD BE VISIBLE, PARTICULARLY IN LIGHT OF THE FACT THAT I DON'T THINK THE

GOVERNMENT HAS REALLY GIVEN ANY SPECIFIC EXAMPLE OF A REAL SECURITY CONCERN. I'LL -- MAYBE --

THE COURT: THANK YOU.

MR. CLEARY.

MR. CLEARY: YOUR HONOR, I WOULD JUST LIKE TO MAKE A VERY BRIEF POINT ABOUT THE A.P.A. CLAIM. THE PLAINTIFFS' PAPERS SAY THAT THIS NOTICE SHOULD HAVE BEEN PUBLISHED IN THE FEDERAL REGISTER. THE REASON IT WASN'T PUBLISHED IN THE FEDERAL REGISTER IS 36 C.F.R. 1.5(B), WHICH SETS THE PRECONDITIONS FOR WHEN PUBLICATION IN THE FEDERAL REGISTER IS REQUIRED. AND I COULD JUST READ THAT INTO THE RECORD, THAT:

"EXCEPT IN EMERGENCY SITUATIONS, A CLOSURE, DESIGNATION, USE OR ACTIVITY RESTRICTION OR CONDITION, OR THE TERMINATION OR RELAXATION OF SUCH, WHICH IS" -- AND THESE ARE THE CRITICAL TERMS -- "WHICH IS OF A NATURE, MAGNITUDE AND DURATION THAT WILL RESULT IN A SIGNIFICANT ALTERATION IN THE PUBLIC USE PATTERN OF THE PARK AREA", THEN THE SECOND IS, "ADVERSELY AFFECT THE PARK'S NATURAL AESTHETIC, SCENIC OR CULTURAL VALUES; THIRD, REQUIRE A LONG-TERM OR SIGNIFICANT MODIFICATION IN THE RESOURCE MANAGEMENT OBJECTIVES OF THE UNIT; OR, FOURTH, IS OF A HIGHLY CONTROVERSIAL NATURE, SHALL BE PUBLISHED AS RULE-MAKING IN THE FEDERAL REGISTER." AND WE SUBMIT THAT THIS DOESN'T MEET ANY OF THOSE FOUR SPECIAL CATEGORIES OF USE RESTRICTIONS THAT NEED TO BE PUBLISHED IN THE FEDERAL REGISTER.

AND THE PREAMBLE, "EXCEPT IN EMERGENCY SITUATIONS", ALSO HAS SOME RELEVANCE HERE, ALTHOUGH WE DON'T PLACE OUR PRINCIPAL RELIANCE ON THAT RIGHT NOW. THE MAIN REASON IS THAT -- THE FIRST ONE IS THE ONE MOST FREQUENTLY USED, I GUESS, IS MY UNDERSTANDING, AND IT SAYS, "OF A NATURE, MAGNITUDE AND DURATION THAT WILL RESULT IN SIGNIFICANT ALTERATION." AND THAT SIMPLY IS NOT ANYWHERE NEAR THE CASE ON THE FACTS BEFORE THE COURT ON THIS MOTION FOR A T.R.O.

IN SUMMATION, THE FOUR-PART TEST APPLICABLE TO T.R.O. APPLICATIONS, WE SUBMIT, HAS NOT BEEN MET ON ANY SINGLE ONE OF THE FOUR PARTS. JUDGE OBERDORFER REACHED THE RIGHT RESULT, WE SUBMIT, IN 1987, AND WE ALSO SUBMIT THAT THE T.R.O. TODAY SHOULD BE DENIED.

THANK YOU.

THE COURT: ALL RIGHT.

ESSENTIALLY, THE PLAINTIFFS, WHO HAVE FILED THEIR CAUSE OF ACTION YESTERDAY AND IT HAS BEEN BROUGHT TO THE ATTENTION OF THE COURT TODAY AND WE HAVE JUST NOW HAD OUR HEARING ON THE TEMPORARY RESTRAINING ORDER, INCLUDING TWO WITNESSES BROUGHT ON BEHALF OF THE GOVERNMENT -- ESSENTIALLY, THE ARGUMENTS OF THE PLAINTIFF THAT HAVE BEEN ADVANCED ARE THREEFOLD: THAT THERE IS AN ANTICIPATED DEPRIVATION OF FREEDOM OF SPEECH, FREEDOM OF ASSOCIATION, AND A FAILURE OF THE GOVERNMENT TO COMPLY WITH APPLICABLE REGULATIONS IN THE ADMINISTRATIVE PROCEDURE ACT. THIS RESULTS AS A CONSEQUENCE OF THE NOTICE TO THE PUBLIC AND TO

THE PLAINTIFFS HEREIN THAT THE SOUTHERN PORTION OF LAFAYETTE PARK IN WASHINGTON, D. C. WILL BE CLOSED TO THE PUBLIC AND DEMONSTRATORS' USE FOR SHORT PERIODS OF TIME DURING THE BUSH-GORBACHEV SUMMIT, MAY 31 TO JUNE 3, 1990.

THE NOTICE GOES ON TO STATE, AND I AM QUOTING, "PERSONS DEMONSTRATING OR OTHERWISE USING THE PARK IN THE PORTION NOTED ON THE ATTACHED DRAWING SHOULD REMOVE THEMSELVES AND ANY PERSONAL PROPERTY FROM THAT AREA WHEN NOTIFIED BY THE UNITED STATES PARK POLICE. YOU MAY, IF YOU WISH, LEAVE YOUR DEMONSTRATION SIGNS DURING THE BRIEF CLOSURES. HOWEVER, THE NATIONAL PARK SERVICE CANNOT ACCEPT RESPONSIBILITY FOR YOUR PERSONAL PROPERTY. THESE ACTIONS ARE NECESSARY TO PROVIDE FOR A SECURE ROUTE OF ACCESS FOR THE VISITING HEAD OF STATE." AND IT IS SIGNED BY JAMES MCDANIEL, ASSOCIATE REGIONAL DIRECTOR, NATIONAL CAPITAL REGION, NATIONAL PARK SERVICE.

THE GOVERNMENT HAS ARGUED THAT IT HAS VALID SECURITY CONCERNS FOR A VISITING HEAD OF STATE, MR. GORBACHEV, PRESIDENT AND SECRETARY-GENERAL OF THE U. S. S. R., AND FOR HIS SPOUSE, AND THAT THE GOVERNMENT, IT CONTENDS, HAS LIMITED THE CLOSURE TO THE PUBLIC OF THE PORTION STATED OF LAFAYETTE PARK WITH A CONCERN FOR THE LEAST RESTRICTIVE METHOD POSSIBLE AS TO TIME, PLACE, SCOPE AND ACTIVITY.

THE GOVERNMENT HAS SAID THROUGH TESTIMONY AND ARGUMENT THAT THE PUBLIC, INCLUDING ALL DEMONSTRATORS, NOT JUST THE PLAINTIFFS WHO ARE IN THIS CASE, AND ALL OTHER MEMBERS OF THE

PUBLIC, WILL ON THE OCCASIONS OF NEEDED MOTORCADE ACCESS TO AND FROM THE PENNSYLVANIA SIDE OF THE WHITE HOUSE, FOR PERIODS OF TIME LASTING FROM 45 MINUTES TO ONE HOUR ON EACH OCCASION, WILL FIND IT NECESSARY TO MOVE THE PUBLIC BACK 50 TO 75 FEET FROM THE SIDEWALK INTO THE PARK AREA IN ORDER TO PERMIT SECURITY MEASURES TO TAKE PLACE, INCLUDING, IF AND AS APPROPRIATE, K-9 ACTIVITY, BOMB SWEEP, AND OTHER MATTERS DEEMED NECESSARY BY THE COLLECTIVE EXPERIENCE AND JOINT DECISION OF THE UNITED STATES PARK POLICE AND THE SECRET SERVICE TO BEST SECURE THE AREA. THIS IS BASED ON NOT ONLY INTELLIGENCE SOURCES, BUT ALSO EXPERIENCIAL SOURCES STEMMING FROM THE 1987 VISIT OF PRESIDENT GORBACHEV TO THE WHITE HOUSE.

12 THE DURATION WILL BE, AS EARLIER STATED, FROM MAY 31 TO JUNE 3, 1990, AND FOR ONLY PORTIONS OF TIME ON THOSE SPECIFIC DATES, AND ONLY WHEN THE MOTORCADE IS TO BE EXERCISED TO AND FROM THE PENNSYLVANIA ENTRANCE AND EXIT INTO THE WHITE HOUSE, AND THIS BECAUSE THE MOTORCADE HAS TO COME TO A PARTICULARLY SLOW TURN AND DEVELOPMENT AT THAT PORTION.

THE REMAINDER OF LAFAYETTE PARK WILL REMAIN OPEN. THE DEMONSTRATORS' SIGNS, ANY AND ALL OF THEM THAT ARE THERE, WILL NOT BE REMOVED. THE TESTIMONY IS, AND THE GOVERNMENT OFFERS ITS ASSURANCE IN THIS REGARD, THAT IT WILL USE ITS BEST EFFORTS, AS IT DID IN 1987 AND AS IT INTENDS TO CONTINUE TO DO, TO SECURE THE SANCTITY OF THOSE SIGNS AND OF THOSE COMMUNICATIVE METHODS OF THESE PLAINTIFFS AND ALL OTHER MEMBERS OF THE PUBLIC AND

OTHER DEMONSTRATORS. AND WHILE THE GOVERNMENT WILL NOT GUARANTEE BECAUSE OF POTENTIAL EMERGENCY SITUATIONS, NONETHELESS, THE GOVERNMENT HAS ASSURED THE COURT AND THE -- THE COUNSEL FOR THE GOVERNMENT HAS ASSURED THE COURT THAT BEST EFFORTS WILL BE USED BY THE DEFENDANTS TO PROTECT AND SAFEGUARD THE PLAINTIFFS' COMMUNICATIVE MATTERS AND SIGNS.

THERE IS NO QUESTION THAT ANY INFRINGEMENT ON ANY LIBERTY OF ANYONE IS AN ABRIDGEMENT OF THAT LIBERTY AND IS A WHITTLING AWAY OF THOSE LIBERTIES. BUT THE GOVERNMENT, IN CONCERTED EFFORT TO DETERMINE WHAT WOULD BE THE LEAST RESTRICTIVE METHOD POSSIBLE, FIRST CONSIDERING CLOSING THE ENTIRETY OF LAFAYETTE PARK, SECONDLY, CONSIDERING CLOSING HALF OF LAFAYETTE PARK, AND LASTLY, COMING TO WHAT IT DEEMS THE LEAST RESTRICTIVE CONSONANT WITH ITS SECURITY CONCERNS, THE GOVERNMENT ENTERED UPON THE MEASURE THAT IT HAS PRESENTLY ADVANCED.

THE GOVERNMENT HAS INVOKED 18 U.S.C. 3056 FOR VISITING HEADS OF FOREIGN STATES OR FOREIGN GOVERNMENTS AND HAS DISAGREED WITH THE PLAINTIFFS THAT IT HAS A REQUIREMENT UNDER 36 CFR 1.5(B) TO PUBLISH AS RULEMAKING IN THE FEDERAL REGISTER THIS ACTIVITY THAT IS DEMONSTRATED THROUGH THE NATURE OF THE NOTICE TO THE PUBLIC. IT HAS CONSIDERED AND DETERMINED THAT ITS ACTIONS WILL NOT RESULT IN A SIGNIFICANT ALTERATION IN THE PUBLIC USE PATTERN OF THE PARK AREA OR ADVERSELY AFFECT THE PARK'S NATURAL AESTHETIC, SCENIC OR CULTURAL VALUES AND THAT IT DOES NOT REQUIRE A LONG-TERM OR SIGNIFICANT MODIFICATION IN THE

OBJECTIVES OF THIS UNIT AND IS NOT OF A HIGHLY CONTROVERSIAL NATURE. AND WHILE IN SMALL PART IT INVOKES THE EMERGENCY SITUATION ASPECT OF THAT REGULATION, IT RELIES MORE SIGNIFICANTLY ON THE OTHER ASPECTS OF THAT REGULATION.

AS WE KNOW, A TEMPORARY RESTRAINING ORDER MAY BE GRANTED ONLY -- AND IT IS AN EMERGENCY MEASURE AND IT IS AN EXTRAORDINARY MEASURE. IT MAY BE GRANTED ONLY WHEN THE PLAINTIFFS HAVE DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS, THAT IRREPARABLE INJURY WILL RESULT IN THE ABSENCE OF THE REQUESTED RELIEF, THAT NO OTHER PARTIES MAY BE HARMED IF TEMPORARY RELIEF IS GRANTED, AND THAT THE PUBLIC INTEREST FAVORS ENTRY OF A TEMPORARY RESTRAINING ORDER. AND WE HAVE CASES LEGION ON THAT, PARTICULARLY OUR VIRGINIA PETROLEUM JOBBERS AND OUR WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION VERSUS HOLIDAY TOURS CASES.

THE GOVERNMENT, ITS ARGUMENTS THAT I HAVE RECITED HEREIN WILL BE SUSTAINED AND THE COURT WILL DENY THE TEMPORARY RESTRAINING ORDER, FINDING THAT THERE IS NOT A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS, FINDING THAT WHILE THERE IS INJURY, IT IS LIMITED IN ITS SCOPE, DURATION, ACTIVITY AND TIME AND PLACE, AND THAT THE PUBLIC INTEREST AND THE OTHER PARTIES WHICH OFTEN ENTWINE, AS THEY DO HERE, WILL BEST BE SERVED BY THE DENIAL OF THE ENTRY OF A TEMPORARY RESTRAINING ORDER, AND IT IS SO DENIED.

AT THIS POINT I MUST ASK WHETHER OR NOT THERE IS ANY

CASE OR CONTROVERSY LEFT.

MR. THOMAS: I WOULD LIKE TO MOVE, IF I MAY, YOUR HONOR, FOR THE COURT TO PLEASE PROVIDE US WITH AN OVERNIGHT TRANSCRIPT, BECAUSE I THINK THAT WE WOULD LIKE TO APPEAL. AND SINCE THIS IS A LIMITED --

THE COURT: WELL, SIR, LET ME INTERRUPT YOU AND SAY THAT IT IS UNUSUAL. I GUESS IT'S NOT -- I GUESS THERE HAVE BEEN RARE OCCASIONS WHEN IT MAY HAVE BEEN INVOKED. IT'S A LITTLE BIT UNUSUAL THAT THE COURT OF APPEALS MAY GRANT AN APPEAL IN THIS REGARD FROM THE DENIAL OF A TEMPORARY RESTRAINING ORDER. NONETHELESS, I WON'T PREVENT YOU FROM ATTEMPTING TO APPEAL IF THAT IS WHAT YOU WISH. AND CERTAINLY THE TRANSCRIPT OF THIS RECORD WILL REPRESENT MY FINDINGS OF FACT AND CONCLUSIONS OF LAW WHEN IT IS TRANSCRIBED. AND I WILL MERELY ISSUE A ONE-LINE ORDER DENYING THE TEMPORARY RESTRAINING ORDER AND MAKING REFERENCE TO THE TRANSCRIPT.

I DON'T KNOW IF MY REPORTER CAN PREPARE IT OVERNIGHT. I WILL ASK HIM WHEN HE IS ABLE TO DO SO. AS YOU CAN WELL APPRECIATE, IT'S 5:30 THIS AFTERNOON.

MR. THOMAS: IF I MAY JUST EXPLAIN MY REASONS FOR THAT, BECAUSE AS YOU POINTED OUT, I GUESS THERE'S NOT MUCH CASE LEFT. AND THIS, I THINK YOUR DENIAL OF THE TEMPORARY RESTRAINING ORDER TODAY AMOUNTS TO A JUDGMENT ON THE MERITS, AND SO WE THINK THAT WE ARE ENTITLED TO AN EMERGENCY APPEAL BECAUSE OF THE RIGHTS THAT WE'RE TALKING ABOUT HERE. MR. GORBACHEV IS GOING TO BE

LEAVING ON FRIDAY, AND IF WE DON'T -- OR ON THE 1ST.

THE COURT: FRIDAY IS THE 1ST OF JUNE, SIR.

MR. THOMAS: I THINK THAT'S WHEN HE --

THE COURT: I BELIEVE THIS PROVISION CARRIES THROUGH SUNDAY.

THE WITNESS: OKAY. THEN HE'LL BE LEAVING ON SUNDAY.

THE COURT: WELL, LET ME HEAR FROM THE GOVERNMENT ABOUT THAT POINT.

MR. CLEARY: YOUR HONOR, IT'S OUR UNDERSTANDING THAT THIS WAS NOT THE HEARING ON THE PRELIMINARY INJUNCTION APPLICATION BY THE PLAINTIFF, AND WE CERTAINLY HAVE NOT CONSENTED TO CONSOLIDATION OF THE MERITS OF THIS CASE WITH THE PRELIMINARY INJUNCTION WHEN AND IF THAT'S HEARD. AND I DON'T AGREE WITH MR. THOMAS THAT THIS IS THE LEAST BIT APPEALABLE. IT IS JUST THE DENIAL OF A TEMPORARY RESTRAINING ORDER.

AND I DON'T -- AND I JUST REITERATE THAT I DON'T CONSENT IN ANY WAY TO CONSOLIDATION OF THE MERITS WITH THE T.R.O. EVEN IF THAT WAS POSSIBLE UNDER THE RULES.

THE COURT: IT IS GOING TO BE UP TO MR. THOMAS TO TALK TO THE REPORTER WHEN I LEAVE THIS BENCH TO DECIDE WHAT HE WISHES TO DO. I NEVER RESTRAIN ANYONE IN THEIR ATTEMPT TO APPEAL IF THEY CHOOSE TO DO SO. I HAVE NOT DISMISSED THE CASE YET, AND I WILL BE CONSIDERING WHEN WE WILL HAVE BRIEFING ON THE PRELIMINARY INJUNCTION, WHICH WAS THE SECOND STAGE THAT YOU DID ASK FOR AT THE TIME THAT WE CAME HERE TODAY TO HAVE THIS HEARING, SIR.

IT WAS PART OF YOUR PAPERING, AS YOU KNOW. AND THAT IS A STAGE THAT WE USUALLY DIRECT BRIEFING AND ASK FOR A CERTAIN PERIOD OF TIME. AND I WILL PLAN TO DO THAT IN THE NEXT FEW MOMENTS AND BE ISSUING A VERY BRIEF ORDER IN THAT REGARD.

THE COURT IS IN RECESS, SIR.

(PROCEEDINGS CONCLUDED AT 5:26 P.M.)

CERTIFICATE OF REPORTER

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

[signature] 11/10/98

# INDEX


OPENING STATEMENT ON BEHALF OF PLAINTIFFS BY MR. THOMAS - PAGE 4

OPENING STATEMENT ON BEHALF OF DEFENDANTS BY MR. CLEARY - PAGE 5

RESPONSE ON BEHALF OF PLAINTIFFS BY MR. THOMAS - PAGE 11

| WITNESSES FOR THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LEONARD JAMES TANNIS | 13 | 19 | | |
| CARL R. HOLMBERG | 24 | 27 | | |

CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS BY MR. THOMAS - PAGE 35

CLOSING ARGUMENT ON BEHALF OF DEFENDANTS BY MR. CLEARY - PAGE 38

FINDINGS OF FACT AND CONCLUSIONS OF LAW BY THE COURT - PAGE 39

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONCEPCION PICCIOTTO, et al.,

Plaintiffs,

v.

MANUEL LUJAN, et al.,

Defendants.

Civil Action No. 90-1261 JHG

MOTION TO DISMISS

Defendants hereby move pursuant to Fed. R. Civ. P. 12(b)(1), (2), (4), (5) and (6) to dismiss this case for lack of jurisdiction over the subject matter, lack of personal jurisdiction, insufficiency of process, insufficiency of service of process and failure to state a claim upon which relief can be granted. A memorandum of points and authorities in support of this motion and a proposed order are attached hereto.

Respectfully submitted,

JAY B. STEPHENS, D.C. Bar #177840
United States Attorney

JOHN D. BATES, D.C. Bar #934927
Assistant United States Attorney

MICHAEL L. MARTINEZ, D.C. Bar #347310
Assistant United States Attorney

JOHN C. CLEARY, D.C. Bar #406339
Assistant United States Attorney

OF COUNSEL:

RICHARD ROBBINS, Esq.
RANDY MYERS, Esq.
Department of the Interior

THOMAS E. DOUGHERTY, Esq.
United States Secret Service

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied and defendants' motion to dismiss should be granted.

Respectfully submitted,

JAY B. STEPHENS, D.C. Bar #177840
United States Attorney

JOHN D. BATES, D.C. Bar #934927
Assistant United States Attorney

MICHAEL L. MARTINEZ, D.C. Bar #347310
Assistant United States Attorney

JOHN C. CLEARY, D.C. Bar #406339
Assistant United States Attorney

OF COUNSEL:

Richard Robbins, Esq.
Randy Myers, Esq.
Department of the Interior

Thomas E. Dougherty, Esq.
United States Secret Service

FILED

DEC 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONCEPCION PICCIOTTO, et al., Plaintiffs, | |
| v. | Civil Action No. 87-3290-LFO |
| DONALD HODEL, et al., Defendants. | |

MEMORANDUM

At a hearing on December 7, 1987, on plaintiffs' application for a temporary restraining order, two of the plaintiffs made arguments and statements. Defendants presented the testimony of Steven J. Harrison of the U.S. Secret Service and Robert O. Langston of the U.S. Park Police. They testified, among other things, that in their opinion removal of the public from the South End of Lafayette Park was required as a security measure during visits by Mikhail Gorbachev to the White House. They, as well as the Assistant United States Attorney, represented that the defendants could and would instruct the officers in the vacated area of Lafayette Park to use their best efforts to protect the signs maintained by plaintiffs throughout the periods during which plaintiffs are removed from the signs' vicinity. Plaintiffs themselves undertook peaceably to remove any possessions or paraphenalia of theirs, other than the stationary signs, from the restricted area when requested



EXHIBIT A-4

to do so by the U.S. Park Police during the period of the notice. Accordingly, in reliance on defendants' representations, and recognizing the authority granted to defendants by 18 U.S.C. section 3056(a)(5) as well as 36 C.F.R. section 1.5, the Court denied the application for a temporary restraining order from the bench (a transcript of that order is attached).

Date: December 9, 1987

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

ATT

FILED

DEC 9 1987

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

(EXCERPT FROM TRANSCRIPT OF PROCEEDINGS ON DECEMBER 7, 1987, IN WILLIAM THOMAS, ET AL., VERSUS DONALD HODEL, ET AL., CIVIL ACTION 87-3290.)

THE COURT: MR. THOMAS, WILL YOU COME TO THE PODIUM AGAIN, PLEASE.

YOU ARE RIDING BEHIND THE BLOCKING BACK OF THE FIRST AMENDMENT FOR ALL OF THESE YEARS. YOU ARE NOT IN RED SQUARE. YOU ARE IN LAFAYETTE SQUARE. YOU ARE IN UNDER, AND YOU ARE PROTECTED BY, OUR CONSTITUTION AND BY THE FIRST AMENDMENT AND BY THIS COURT. YOU HAVE HAD ENORMOUS PROTECTION, AND YOU ARE GETTING IT TODAY.

YOU HAVE THE CHIEF OF THE SECRET SERVICE DETAIL, THE CHIEF OF THE PARK POLICE, THREE LAWYERS, A COURT, AND A STAFF IN HERE WORKING AND BEING CONCERNED ABOUT -- AND NOT IMPROPERLY -- YOUR FIRST AMENDMENT RIGHTS. AND THEY ARE BEING PROTECTED IN THE MOST EXQUISITE WAY THAT I CAN CONTRIVE.

NOW, I HAVE A REPRESENTATION FROM THE GOVERNMENT THAT THE OFFICERS IN LAFAYETTE PARK IN THE VICINITY WHERE YOU HAVE BEEN, AND WHERE YOUR SIGNS ARE, WILL MAKE THEIR BEST EFFORTS TO SEE THAT THEY ARE PRESERVED INTACT. THAT IS NOT A GUARANTEE. THIS IS IMPORTANT, BUT THAT IS NOT THE ONLY THING THEY HAVE TO DO, AND THAT IS NOT THEIR PRIMARY MISSION. BUT THEY ARE GOING TO TRY.

IT REQUIRES YOU TO MAKE THE SAME KIND OF GOOD-FAITH EFFORT TO COMPLY WITH THIS NOTICE. THAT IS, THEY HAVE ASKED

YOU TO TAKE YOUR OTHER BELONGINGS OUT OF THERE, AND IT WOULD BE ENTIRELY INAPPROPRIATE, IN LIGHT OF WHAT IS GOING ON HERE, FOR YOU TO QUIBBLE ABOUT THAT.

WHEN THEY ASK YOU TO MOVE, YOU OUGHT TO MOVE EVERY LOCK, STOCK, AND BARRELL, EXCEPT THE SIGNS. DO YOU UNDERSTAND?

MR. THOMAS: THAT IS NO PROBLEM.

THE COURT: AND YOU SHOULD MOVE WHEN THEY ASK YOU TO MOVE, AND DO NOT ARGUE WITH THEM; JUST MOVE.

MR. THOMAS: I AM DOING MY ARGUING HERE.

THE COURT: I UNDERSTAND THAT. THAT IS WHY I AM MAKING THE TIME AVAILABLE TO YOU NOW, SO YOU CAN WORK THAT OUT. IN RELIANCE ON THE REPRESENTATION BY THE UNITED STATES AND ON BEHALF OF THE PARK POLICE AND THE SECRET SERVICE THAT THE OFFICERS ON THE SCENE IN LAFAYETTE PARK WILL BE INSTRUCTED TO USE THEIR BEST EFFORTS TO SAFEGUARD YOUR SIGNS, I AM DENYING YOUR APPLICATION FOR A TEMPORARY RESTRAINING ORDER.

AND THAT IS JUST THE SIGNS OF THE INDIVIDUAL PLAINTIFFS I CAN'T TAKE CARE OF OTHER PEOPLE. THIS IS NOT A CLASS ACTION. IF THE PARK POLICE WANT TO TAKE CARE OF THEM, THEY CAN. THEY ARE NOT OBLIGATED TO ME TO DO IT.

AND IT IS ALSO MY UNDERSTANDING THAT THERE WILL BE PLANNING ABOUT WHEN YOU HAVE TO MOVE, SO THAT IT IS NOT ABRUPT.

MR. THOMAS: AS I STATED AT THE BEGINNING, THERE WERE SOME OTHER INDIVIDUALS..

THE COURT: I UNDERSTAND THAT.

MR. THOMAS: (CONTINUING) -- WHO ARE INTERESTED.

THE COURT: MY JURISDICTION IS LIMITED TO CASES AND CONTROVERSIES, AND I CAN ONLY PROTECT THE PLAINTIFFS BEFOR ME.

MR. THOMAS: WELL, SOME OF THE INDIVIDUALS ARE HERE IN COURT.

THE COURT: THEY MAY BE, BUT THEY ARE NOT IN COURT ON PAPER. MAYBE YOU CAN WORK THAT OUT WITH WHOEVER THE SECRET SERVICE DETAIL OR THE PARK POLICE DETAIL IS, TO DEAL WITH YOU ON THIS.

IS THERE ANYTHING ELSE?

MR. THOMAS: I APPRECIATE THE PROCESS THAT HAS GONE ON IN THE COURT, BUT I WOULD POINT OUT THAT IT MAY NOT HAVE BEEN NECESSARY, IF I HAD RECEIVED THE NOTICE PRIOR TO --

THE COURT: I AM SORRY ABOUT THAT. I AM REALLY NOT SORRY ABOUT IT. I THINK THAT THIS HAS BEEN A GOOD EXERCI AND I EXPECT IT TO BE HANDLED IN A CORRECT WAY.

MR. THOMAS: THANK YOU.

MR. MARTINEZ: THANK YOU, YOUR HONOR.

(WHEREUPON, AT 5:35 O'CLOCK P. M., THE COURT ADJOURN THE HEARING.)